John GREEN, individually and on behalf
of all those similarly situated,
Plaintiffs,

v.

Charles JOHNSON et al., Defendants.

Civ. A. No. 79–1358–F.

United States District Court,
D. Massachusetts.

May 8, 1981.

Victoria Pulos, Western Mass. Legal Services, Northampton, Mass., Ira Horowitz, Susan Bennett, Western Mass. Legal Services, Springfield, Mass., for plaintiffs.

W. Michael Ryan, Ryan & Ryan, Northampton, Mass., for John Boyle.

J. David Keaney, Egan, Flanagan & Egan, Springfield, Mass., for Michael J. Ashe.

Terry Jean Seligmann, Asst. Atty. Gen., Government Bureau, Boston, Mass., for State defendants.

Geoffrey A. Wilson, Trudel, Bartlett, Barry & Filler, Greenfield, Mass., for Donald M. McQuade.

James A. Bowes, North Adams, Mass., Charles M. Maguire, Donovan & O'Connor, Adams, Mass., for Carmen Massimiano.

## MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

FREEDMAN, District Judge.

This action came to be heard on March 3, 1981 regarding the motions of the plaintiff John Green for certification of a class pursuant to F.R.Civ.P. 23, and for a preliminary injunction pursuant to F.R.Civ.P. 65; also heard were the motions of defendants Ashe and Massimiano to dismiss the case as to them pursuant to F.R.Civ.P. 12(b)(6). Following the hearing, defendant John Boyle also moved to dismiss, and this motion is also considered herein.

In prior proceedings I heard the state defendants' (as defined herein) motions to dismiss and by Memorandum and Order dated February 24, 1981 denied those motions.

## I. FINDINGS OF FACT

1. Plaintiff John Green filed this action in 1979 while a twenty-one year old inmate serving a sentence at the Franklin County House of Correction. He brought suit seeking declaratory and injunctive relief for himself and a class of persons he identified in ¶ 17 of the complaint as follows: present and future inmates of the Franklin, Hampshire, Hampden, and Berkshire County Houses of Correction who are under the age of twenty-two, have not received a high school diploma, and are eligible for a free and appropriate special education.

2. Plaintiff has received a General Equivalency Diploma and has been released from custody since the initiation of this action. Intervenors on plaintiff's side have likewise either been released from custody, received the services which they sought, or are no longer entitled to those services.

3. Plaintiff and the intervenors on plaintiff's side have been represented throughout this litigation by attorneys from Western Massachusetts Legal Services.

4. The defendants in this action fall into two discrete groups. The first group is composed of various officials of the Commonwealth of Massachusetts involved in the planning, funding, and delivery of educational services in the Commonwealth, who are identified collectively herein as the "state defendants." The second group is composed of the sheriffs of the Houses of Correction of Franklin, Hampshire, Hampden, and Berkshire Counties.

5. In his complaint, plaintiff alleged that because of the policies and practices

adopted by the state defendants with regard to the delivery of special education services to inmates incarcerated at the four County Houses of Correction named above, he and the class he sought to represent were being denied special educational services to which they were entitled under federal and state law.

6. However, in the interim between filing of the suit and the hearing on March 3, 1981, funding for the delivery of special educational services at the Hampden and Berkshire County Houses of Correction has been arranged under one-year grants. These funding arrangements are discussed in more detail, *infra.*

### A. The Existence of a Class

7. The plaintiff has submitted the affidavit of Dr. Milton Budoff, a psychologist specializing in the area of special needs of handicapped children and their special educational needs. Based on this affidavit, I find as follows:

  A. A variety of studies indicate the high prevalence of serious academic difficulties among delinquent children.

  B. According to a national survey of handicapped children eligible for special education services incarcerated in juvenile correctional institutions:

   1. Compared to the national average incidence of handicapped children of 12.3% some type of handicapping condition is found to exist in 42.4% of delinquent children committed to correctional institutions.

   2. The handicapping conditions with the highest incidence rates in correctional facilities were:

   a) emotional disturbance (16.23%);

   b) learning disabilities (10.59%); and

   c) educable mental retardation (7.69%).

  C. Experts have estimated the extent of mental retardation within youth correctional institutions at between 3% and 9.5%.

  D. Of a study group of 477 delinquent children, 60% were found to be two or more years retarded in their expected reading levels.

  E. An expert has found that 50% to 80% of delinquents have some form of learning disability while learning disabled children form only 12% of total children.

  F. A screening test of over 100 juvenile delinquents revealed that 81% were learning disabled.

  G. An expert has found that an unexpectedly high proportion of delinquents in youth service detention centers in Massachusetts have neurological symptoms associated with learning disabilities.

8. Based on these findings, I further find that among the inmate populations of the County Houses of Correction of Franklin, Hampshire, Hampden and Berkshire Counties, a significant number of inmates are apt to have learning disabilities and other educational handicaps.

9. Regarding the number of inmates at the County Houses of Correction of Franklin, Hampshire, Hampden and Berkshire Counties who are under age twenty-two and without high school diplomas, I make the following findings based on answers to interrogatories, exhibits attached to a stipulation reached by the parties, exhibits introduced by plaintiff, and the testimony of Paul Cohen, Special Education Coordinator at the Franklin County House of Correction, and James McCauley, Correctional Services Educational Coordinator for the Hampshire County House of Correction:

  A. Statistics compiled by the Statewide Priority Populations Program indicate that approximately one quarter of the inmate population in Massachusetts is under twenty-two years of age and that over 70% are without a high school diploma.

  B. Admissions data from 1976 to 1980 at the Berkshire County House of Correction shows that 56% of the sentenced inmates are between the ages of seventeen and twenty-two and that 70% do not have a high school diploma.

C. Statistics gathered by the Hampden County House of Correction show that it confines over 600 sentenced inmates in a year, that at any given point in time one-half is under the age of twenty-two and that 75% of those under twenty-two do not have high school diplomas and are eligible for special education services.

D. Monthly reports compiled by Paul Cohen show that the number of inmates at the Franklin County House of Correction under twenty-two years of age who were without a high school diploma was 16 in January 1980; 12 in February 1980; 12 in March 1980; and 12 in April 1980.

E. Monthly reports compiled by Debbie Burzdak, former Special Education Coordinator for the Hampshire County House of Correction show that of the 23 inmates under twenty-two in the facility in October 1979, 18 did not have a high school diploma; of the 25 inmates under twenty-two in November 1979, 19 did not have a diploma; of the 26 inmates under twenty-two in December 1979, 19 did not have a diploma; of the 28 inmates under twenty-two in January 1980, 19 did not have a diploma; of the 30 inmates under twenty-two in February 1980, 17 did not have a diploma; of the 28 inmates under twenty-two in March 1980, 19 were without diplomas; and of the 27 inmates in April 1980, 15 had no diplomas.

F. The Hampshire County House of Correction has an annual inmate population of 250 to 300; an average daily count of 90; and in October 1979, 18 inmates under twenty-two without a high school diploma.

G. The Franklin County House of Correction has an average daily count of 40.02, and in October 1979, 6 inmates under twenty-two without a high school diploma.

H. The Berkshire County House of Correction has an annual inmate population of 300; an average daily count of 65.2 inmates in 1977 to 1978, and 69.8 in 1978 to 1979.

I. The Hampden County House of Correction has an annual inmate population of 600 and as of February 1980, there were 60 inmates under twenty-two without a high school diploma.

J. A substantial number of inmates between ages seventeen and twenty-two who are without high school diplomas, and who have a high probability of special education needs are presently and at any given point in time incarcerated at the correctional facilities in Hampshire, Hampden, Berkshire and Franklin Counties.

K. The inmate populations at the Hampden, Hampshire, Berkshire and Franklin County Houses of Correction are constantly revolving.

10. Regarding the inmate population at the Franklin County House of Correction, I find as follows:

A. Paul Cohen is the Special Education Coordinator at the Franklin County House of Correction. He screens all inmates at the facility who are under twenty-two years of age and are without a high school diploma. Since January 1980, he has interviewed 31 inmates in this group who expressed an interest in special education.

B. Cohen has referred 15 of the 31 inmates for a special education evaluation, of which four or five remain in the Franklin County House of Correction. Individualized Education Plans (IEP's) were developed for five of the 15 inmates referred.

C. Inmates at Franklin stay from 30 days to one and one-half years with an average stay of six to eight months. From one to seven new inmates who are between seventeen and twenty-two years old and without high school diplomas are admitted each month.

D. Of the five inmates who were referred for evaluation and had IEP's

prepared, none has received the services listed in the IEP because the Franklin facility does not have a special education program to implement the IEP's of these inmates.

E. Inasmuch as he knows the Franklin facility will not provide the special educational services set out in an inmate's IEP, Cohen does not refer inmates for evaluations immediately after the screening interview, but rather waits until the inmate's release date approaches.

11. Regarding the Hampshire County House of Correction, I find as follows:

A. James McCauley is employed by the Hampshire House of Correction as the Education Coordinator. He and his staff operate the educational program at the Hampshire facility. Although he is a certified teacher, McCauley is not certified to teach special education.

B. The Hampshire facility provides educational services to its inmates including vocational education and classes in preparation for the General High School Equivalency Test.

C. When an inmate is admitted to the Hampshire facility, he is interviewed by an institutional caseworker. If the inmate wishes, he is referred to McCauley who assesses the inmate's needs by giving the inmate the Test of Adult Basic Education. Based on test results, McCauley develops an educational plan for the inmate. McCauley also attempts to obtain the educational history of the inmate, including school records.

D. McCauley has performed educational assessments for 50 inmates referred to him by caseworkers since July 1980. Of the 50 inmates assessed by McCauley, 70% had received special educational assessments by their former school districts under state law.

E. Of the 50 inmates assessed by McCauley, over one-half were under age twenty-two and of that one-half, 85% did not have a high school diploma.

F. McCauley has not referred any inmate for special educational evaluation, and no special educational services in accordance with an IEP are being provided to inmates at the Hampshire facility.

B. *Preliminary Injunction*

12. Inmates at the Franklin County House of Correction, although referred to their local school committees for special education evaluation and preparation of IEP's, are not receiving the special educational services set out in their IEP's.

13. Inmates at the Hampshire County House of Correction are not being referred to their local school committees, and thus are neither being evaluated nor having IEP's prepared for them. As a result, special educational services as set out in an IEP are not being delivered to inmates at this facility.

14. Inmates at the Hampden and Berkshire County Houses of Correction are being referred and evaluated, and are having IEP's prepared for them. Delivery to inmates of special education services described in their IEP's is taking place because both facilities have hired a part-time special education teacher and coordinator for 1980–1981 under grants from the Massachusetts Department of Education.

15. Based on the affidavit of Milton Budoff, *supra*, I find as follows:

A. Incarceration in a county jail for an extended period of time can cause harm or loss of opportunity to children when educational programs appropriate to their special needs are denied them or are simply not available. Some inmates who were making progress in a special education school program prior to incarceration may show a marked deterioration in skills. Other inmates because of the lack of special education programs geared to their individual needs during incarceration may be unprepared for job-related training upon release.

B. Although some educational program may be available, it may be of little or no value to an inmate with special needs. Long periods of unproductive time, accompanied by backsliding, reinforcement of low self-esteem, and an increase of frustration can result.

16. Because inmates are only eligible for special education up to age twenty-two under Massachusetts law, the absence of special educational services during incarceration may result in an inmate's ineligibility for services upon release if he is then over age twenty-two, and in any event will always result in a shortened period of eligibility for the actual delivery of services.

17. Based on the stipulation entered into by the parties and the affidavit of Roger W. Brown, Associate Commissioner for Special Education for the Commonwealth, I find as follows:

A. The Massachusetts Department of Education has designated special needs inmates in County Houses of Correction as among its first priorities in 1980–1981. The Department of Education acting through its Division of Special Education has made intensive efforts to assist in the identification of inmates in County Houses of Correction who may have special needs, and to improve access to special education services for this population.

B. As a part of these efforts, the Department of Education awarded a grant to a private, non-profit agency, the Federation for Children with Special Needs [the Federation], for a program entitled Special Education Coordinator Team for Massachusetts in 1980–1981. This grant was to support the work of special education coordinators (liaison coordinators) who assist local school districts and County Houses of Correction in identifying eligible inmates who may have special needs and who wish to be referred for special education evaluations. These coordinators also were to identify appropriate assessment and service delivery resources in order to facilitate the development of Individual Educational Plans. The Fiscal Year 1981 grant to the Federation totals $190,014.

C. In addition to the grant to the Federation, the Department of Education made available in Fiscal Year 1981 a separate pool of federal special education funds for all County Houses of Correction that might choose to apply for the funds for the hiring of teaching staff to provide direct special education services to eligible inmates.

18. At one time, liaison coordinators funded by the grant to the Federation were working in the County Houses of Correction in Franklin, Hampshire, Hampden and Berkshire Counties. However, no liaison coordinator is presently at the Hampshire County facility.

19. Hampden and Berkshire Counties applied for and were awarded grants from the separate pool of federal special education funds for the hiring of teaching staff described in the Complaint, ¶ 17, *supra.* The Houses of Correction of Franklin and Hampshire Counties have not applied for these grants.

20. The Department of Education has no funds, federal or state, at the present time which can be granted to the County Houses of Correction to develop special education programs.

21. The Department intends to set aside for Fiscal Year 1982 a joint pool of federal adult education funds and special education funds so that grants may be awarded to the County Houses of Correction. The total amount of this fund, subject to appropriation, will be between $300,000 and $400,000.

22. The conflicting interpretations of Massachusetts General Laws (M.G.L.) c. 127 § 48 made by the state defendants and the Sheriffs of the County Houses of Correction have resulted in disputes regarding upon whom the Massachusetts legislature has placed the initial or primary responsibility for the actual delivery of special education services to inmates in the County Houses of

Correction. In the context of these disputes, and based upon the affidavit of Roger Brown and the representations of counsel for the parties in their memoranda and at oral argument, I find the following:[1]

A. The state defendants believe that the best model to be used in the County Houses of Correction in delivering special education services to inmates is a joint adult education and special education grant, and that this is the best way to provide the broad range of educational services plaintiffs need.

B. The Department of Education distinguishes between the determination of need for special education on the one hand, and the actual delivery of special education services on the other hand. The Department has taken the position that while school committees under their jurisdiction are required to identify, evaluate and develop IEP's for inmates at the County Houses of Correction, it is the responsibility of the administrators of these facilities (i. e. the Sheriffs) to actually deliver the services set forth in an IEP to an inmate while incarcerated.

C. The Sheriffs have taken the position that the delivery of special education services to inmates at their facilities is not within their responsibilities under M.G.L. c. 127 § 48.

D. The Sheriffs of the Hampshire and Franklin County Houses of Correction did not apply for special education grants from the Department of Education in Fiscal Year 1981 because they understood that as a condition of the grant they would be required to pay for services after the first year.

E. The positions taken by the respective defendants follow from their good faith interpretation of a seemingly ambiguous state statute, and are not the result of intentional evasion of responsibility.

F. While the Department of Education has taken a number of steps to assure that the Sheriffs of the County Houses of Correction meet what the Department believes to be the responsibility of the Sheriffs, the Department has not as yet sought judicial interpretation of M.G.L. c. 127 § 48 in state court.

## II. CONCLUSIONS OF LAW

### A. General

1. Jurisdiction is vested in this Court to hear plaintiff's claims pursuant to The Handicapped Children Education Act (Handicapped Act), P.L. 94–142, 89 Stat. 773–796 presently codified in 20 U.S.C. §§ 1401 et seq., by 20 U.S.C. § 1415(e)(4); and to hear plaintiff's claims under state law by the principles of pendent jurisdiction.[2]

2. The Handicapped Act establishes a program of cooperative federalism which sets minimum standards with which states must comply in order to be eligible to receive grants of money to assist state and local educational agencies in the provision of a "free and appropriate public education," as defined in 20 U.S.C. § 1401(18).

3. Some of the minimum standards with which states must comply are the following:

---

1. Because the Findings of Fact which follow relate to the positions taken by various defendants as a result of their interpretations of state law, these findings are necessarily admixtures of law and fact, yet are presented here for the purpose of explaining the underlying state law issue in this case. The text of M.G.L. c. 127 § 48 is set forth in relevant part in ¶ 9 of the Conclusions of Law.

2. Plaintiff alleged that this action also arises under the Equal Protection Clause of the U.S. Constitution, Amendment XIV and the Rehabilitation Act of 1976, 29 U.S.C. § 794, and thus alleged a jurisdictional basis in 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(3), as well as 28 U.S.C. §§ 2201 and 2202. Inasmuch as I base my ruling on The Handicapped Children Education Act's jurisdictional provision, I do not address these other jurisdictional grounds.

A. States must have in effect a policy that assures all handicapped children the right to a free and appropriate public education, 20 U.S.C. § 1412(1), and must develop plans which detail policies and procedures which insure the realization of that right, *id.* § 1412(1), (2).

B. States must establish the requisite procedural safeguards, *id.* § 1412(5), and must insure that local educational agencies will establish individualized education programs (IEP's). Id. § 1412(4).[3]

C. States must insure that "a free and appropriate public education will be available for all handicapped children between the ages of three and twenty-one within the state no later than September 1, 1980...," *id.* § 1412(2)(B), unless application of this requirement with respect to three to five and eighteen to twenty-one year olds would be inconsistent with state law or practice or the order of any court respecting public education within such age groups in the state. *Id.*

3. The Handicapped Act requires that:

The state educational agency shall be responsible for assuring that the requirements [of this Act] are carried out and that all educational programs for handicapped children within the state, *including all such programs administered by any other state or local agency,* will be under the general supervision of the persons responsible for educational programs for handicapped children in the state educational agency and shall meet educational standards of the state educational agency.

*Id.* § 1412(6) (emphasis supplied). Thus, the ultimate responsibility for administrative oversight of the delivery of education programs for handicapped children lies with the state educational agency, *id., see also* 45 C.F.R. § 121a.500(a) (1980).

4. The Commonwealth of Massachusetts enacted legislation designed to deliver education services to "special needs students" even before the enactment of the Handicapped Act in 1975. St.1972, c. 766, presently codified in M.G.L. c. 71B §§ 1 *et seq.* and c. 15 § 1M. This state law, popularly known as "Chapter 766," provided for the creation of a division of special education within the Commonwealth's Department of Education "to regulate all aspects of, and assist with the development of all special education programs supported in whole or in part by the Commonwealth." M.G.L. c. 15 § 1M(2).

5. Chapter 766 also requires the school committee of every city, town, or school district to "identify the school age children residing therein who have special needs, diagnose and evaluate the needs of such children, prepare a special educational program to meet those needs, provide or arrange for the provision of such special education program, maintain a record of such identification, diagnosis, proposal and program actually provided, and make such reports as the [Massachusetts D]epartment [of Education] may require." M.G.L. c. 71B § 3.

6. For purposes of Massachusetts law, a "school age child" is any person of ages three through twenty-one who has not obtained a high school diploma or its equivalent. *Id.* § 1.

---

**3.** An IEP is defined as:

[A] written program for each handicapped child developed in any meeting by a representative of the local education agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents, or guardian of such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
20 U.S.C. § 1401(19).

7. Massachusetts receives federal funds under the Handicapped Act, and must comply with the minimum requirements set forth in that Act.

8. Chapter 766, in accordance with the Handicapped Act, establishes that the initial or primary responsibility for identifying and evaluating children with special education needs, and for preparing IEP's and delivering services to them lies with local education agencies. M.G.L. c. 71B § 3; *see also* 20 U.S.C. §§ 1401(8) and 1413; 45 C.F.R. §§ 121a.304 and 121a.600 (1980).

9. M.G.L. c. 127 § 48, enacted the day after c. 766, *see* St.1972, c. 777 § 12, provides in relevant part:

> The commissioner [of corrections] shall establish and maintain education, training and employment programs for persons committed to the custody of the department. *The administrators of county correctional facilities shall establish and maintain such programs for persons committed to such facilities. Such programs shall include opportunities for academic education, vocational education, vocational training, other related prevocational programs and employment, and may be made available within correctional facilities or . . . at other places approved by the commissioner or administrator. . . .*

*Id.* (emphasis supplied).

■ 10. The language of M.G.L. c. 127 § 48 is, as a matter of law, not given to ready construction for determining who has the initial or primary responsibility for the provision of direct special educational services to inmates at County Houses of Correction.

11. Resolution of this state law question may and should be undertaken in the first instance in the state courts of the Commonwealth, either by an action seeking declaratory judgment or by certification of questions to the Supreme Judicial Court of the Commonwealth pursuant to S.J.C. Rule 3:21. *See Kartell v. Blue Shield of Massachusetts, Inc.,* 592 F.2d 1191, 1194–95 (1st Cir. 1979).

■ 12. Given the failure of any of the defendants to secure resolution of this state law question of initial or primary responsibility for the delivery of special education services to inmates at County correctional facilities and the ongoing non-delivery of services to inmates at the Hampshire and Franklin County Houses of Correction, separation of this underlying issue of state law from the issues raised by plaintiff's action does not preclude this court from considering the merits of plaintiff's claims and his motions for class certification and for a preliminary injunction.

*B. Class Certification*

13. A party seeking class certification under F.R.Civ.P. 23 bears the burden of showing that the four requirements of F.R. Civ.P. 23(a) are satisfied, and that a class action is maintainable under F.R.Civ.P. 23(b).

14. Plaintiff has alleged that the state defendants have acted or refused to act on grounds generally applicable to the class he seeks to represent, thereby making appropriate final injunctive relief in corresponding declaratory relief with respect to the class as a whole. F.R.Civ.P. 23(b)(2).

■ 15. Because plaintiff himself has received a General Equivalency Diploma and has been released from custody, his claims against the state defendants are moot. With respect to inmates at the Berkshire and Hampden County Houses of Correction, because these inmates are now being identified, referred, evaluated and are having IEP's prepared for them, and are receiving the special education services set forth in their IEP's, their claims as potential class members are also moot.

16. Usually, there must be "a named plaintiff who has . . . a [live] case or controversy at the time a complaint is filed, and at the time the class action is certified by the district court pursuant to Rule 23 . . . ," in order to satisfy Article III of the U.S. Constitution, *Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975). However, "[t]here may be cases in which

the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review." *Id.* at 402 n. 11, 95 S.Ct. at 559 n. 11. *See also, Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975).

17. Thus, the mootness of plaintiff John Green's claims at the present time is not an absolute bar to class certification under Article III. Because of the revolving nature of the inmate population at the County House of Correction and the length of time between filing of a complaint and ruling on a motion for class certification, the claims asserted may be capable of repetition yet evasive of review.

18. The circumstances of this case parallel those described in *Gerstein v. Pugh, supra.* An inmate seeking special education services may be released from custody because of reversal of his conviction on appeal, parole, or completion of his sentence. It is by no means certain that any inmate at the County Houses of Correction would be in custody long enough for this Court to certify the class before his claims were mooted. The existence of inmates who are not receiving special education services is certain. The attorneys representing plaintiffs are federally-funded legal services lawyers with sufficient interest in protecting the rights of inmates being denied services to assure a continuing live interest in this case. Cf. *Gerstein v. Pugh,* 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11. As was held in *Gerstein,* "this case is a suitable exception" to the requirement of *Sosna. Id.*

19. F.R.Civ.P. 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. The evidence presented by plaintiffs indicates that a large number of inmates at the Hampshire County House of Correction are under twenty-two and without high school diplomas, and a significant percentage of this group may be in need of special education services. In addition, at least four inmates at the Franklin facility have had IEP's prepared for them and are not receiving services, and from one to seven potentially eligible inmates are admitted each month. This evidence of numerosity, considered in light of the fact that the inmate population at these facilities is constantly revolving, establishes sufficient numerosity that joinder of all potential members of the class is impracticable. *See Yaffee v. Powers,* 454 F.2d 1362, 1367 (1st Cir. 1972).

20. F.R.Civ.P. 23(a)(2) requires that there be questions of law and fact common to the class. The class members in the instant case share a common factual identity of being inmates in County Houses of Correction who are either entitled, or potentially entitled, to special education services but not receiving them. Although some inmates have already had IEP's prepared for them, while others have not had the opportunity to be referred or evaluated, all members of the class in common are not receiving special education services.

21. Plaintiff John Green's claims at the time of filing the complaint were typical of claims of the class he seeks to represent and did not conflict with the interests of other members of the class. Thus the requirements of F.R.Civ.P. 23(a)(3) are met.

22. F.R.Civ.P. 23(a)(4) requires that the representative party be such as to ensure fair and adequate protection of the interests of the class. Plaintiff is represented by legal services attorneys who have experience in representing persons in institutional settings, in representing juveniles in education and other matters, and in conducting class action legislation. Plaintiff, acting through his attorneys, will fairly and adequately protect the interests of the members of the class.

23. Because the defendants have acted or refused to act on grounds generally applicable to the class in failing to provide special education services and thereby final injunctive and declaratory relief with re-

spect to the class as a whole is appropriate, plaintiff's class action may be maintained under F.R.Civ.P. 23(b)(2).

■ 24. A class composed of all inmates at the Franklin and Hampshire County Houses of Correction who are under age twenty-two, without high school diplomas and are eligible for a free and appropriate special education will be certified; however, F.R.Civ.P. 23(c) provides for conditional certification, subject to alteration and amendment before decision on the merits of an action. Since it is possible that subsequent developments in this suit may reveal that 1) inmates entitled to referral and evaluation, preparation of IEP's and delivery of services do not wish to participate in special education programs; 2) that the number of inmates actually entitled to services is small and joinder of their individual claims is not impracticable; or 3) that inmates simply do not wish to participate in or proceed with this litigation, certification of this class is conditional.

25. Although F.R.Civ.P. 23(c)(4) provides for division of a class into subclasses and treatment of each subclass as a class, such division is not appropriate in this case. While inmates at the Franklin House of Correction are being referred, evaluated, and having IEP's prepared for them on the one hand, and inmates at the Hampshire facility are not, on the other hand, the common claim of inmates at both correctional facilities is that no services are being provided. The subclass of inmates at Franklin probably would not independently satisfy the requirements of F.R.Civ.P. 23(a) and their claims would be left in isolation. As was said in *Yaffee v. Powers*, 454 F.2d 1362, 1367 (1st Cir. 1972) at the juncture of ruling on a motion for class certification, "unless a claim is patently frivolous, [the] court should ask itself: assuming there are important rights at stake, what is the most sensible approach to the class determination issue which can enable the litigation to go forward with maximum effectiveness from the viewpoint of judicial administration?" *Id.* Maximum effectiveness in this case will be achieved by the conditional certifica-

tion of the class as composed of inmates at both Hampshire and Franklin who are under twenty-two, without high school diplomas, and entitled to a free and appropriate special education.

## C. Preliminary Injunctive Relief

26. Plaintiff seeks a preliminary injunction to "enjoin the state defendants from failing to assure that plaintiff class members in Hampshire and Franklin County Houses of Correction receive the special education and related services to which they are entitled."

27. In the First Circuit, a four-prong standard applies to the issuance of preliminary injunctions: plaintiff must demonstrate 1) irreparable injury; 2) a likelihood of success on the merits of the claim; 3) that the balance of hardships tips in his favor; and 4) that the public interest would be furthered by issuance of preliminary relief. *See Automatic Radio Manufacturing Company v. Ford Motor Company*, 390 F.2d 113 (1st Cir.) *cert. denied* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

28. The plaintiff has demonstrated that the class of inmates under twenty-two, without high school diplomas, entitled to a free and appropriate special education are harmed by not receiving services to which they are entitled. The nature of the injury to the class accrues with the passage of time and cannot be remedied through damages. Absent the issuance of a preliminary injunction, this harm to the plaintiff class is significant, ongoing, and irreparable.

■ 29. The plaintiff class has demonstrated to a likelihood that they are entitled to a free and appropriate special education under federal and state law. Their incarcerated status may require adjustments in the particular special education programs available to them as compared to programs available to children with special education needs who are not incarcerated, but their incarcerated status does not eviscerate their entitlement under federal and state law. *See, e. g.* 20 U.S.C. § 1401(16), 45 C.F.R. § 121a.14(a)(1), M.G.L. c. 71B §§ 1, 3 and 12.

30. The plaintiff class has demonstrated to a likelihood that the state defendants have failed to provide all handicapped children between the ages of three and twenty-one a free and appropriate public education in breach of their duties under federal and state law. 20 U.S.C. §§ 1412(1), (4) and (2)(B), and (6); M.G.L. c. 15 § 1M. *See also* 45 C.F.R. § 121a.600(c).

31. Specifically, while defendants have introduced evidence of their efforts to comply with the dictates of federal and state law, these efforts do not obviate the showing of likelihood of failure to fulfill statutory duties made by the plaintiff class, but rather may go to the issue of appropriate relief.

32. Balancing the hardship imposed by the issuance of a preliminary injunction against the hardship to be endured absent its issuance necessarily involves consideration of the scope of the injunction to be issued. Here, the ongoing irreparable harm to the plaintiff class involves the loss, perhaps forever, of special education services to which they are entitled. The hardship to be endured by defendants could involve expenditure of public funds in an unanticipated fashion, but nonetheless in a fashion which may be required by law as an original proposition. Moreover, given the circumstances of this case, a preliminary injunction incorporating all the preliminary relief plaintiff has sought possibly would involve only the cost of hiring qualified personnel to deliver services to inmates until projected grant programs are in place. In light of these considerations, the balance of hardships is in favor of the plaintiff class.

33. The public interest is served by the due and faithful fulfillment by public officials of the duties imposed upon them by law. Indeed, the plaintiff class has demonstrated that issuance of a preliminary injunction in this case would promote the fulfillment of the objectives established by the federal and state statutory schemes involved.

4. *See* 603 C.M.R. §§ 309.0 through 339.4.

34. The plaintiff class has satisfied the four-prong standard applicable to the issuance of a preliminary injunction. This leaves the issue of the proper scope of relief to be afforded by the terms of the preliminary injunction.

### D. Nature of Relief

35. To achieve delivery of special education services to inmates at the Hampshire and Franklin County Houses of Correction, it is essential that the Sheriffs of those facilities and their staffs cooperate with the state defendants.

36. Resolution of the underlying issue of state law, that is, upon whom the state legislature has placed responsibility for the delivery of special education services, must take place before a satisfactory accommodation of the interests of all the parties can be achieved.

37. The policies and procedures necessary for referral, evaluation and preparation of IEP's for inmates under twenty-two years of age, without high school diplomas, and entitled to a free and appropriate special education are in place and can be utilized by the Sheriffs and their staffs at the Hampshire and Franklin County Houses of Correction.[4] Regarding the actual delivery of special education services, the state defendants pursuant to their overall supervisory responsibility must provide these services until funding programs for Fiscal Year 1982 are in place.[5]

### E. Preliminary Injunction

38. Therefore, a preliminary injunction will issue enjoining the state defendants from failing to provide special education services to the plaintiff class in accordance with the following terms:

A. That all inmates at the Franklin and Hampshire County Houses of Correction who are under twenty-two years of age and without high school diplo-

5. These services may be delivered directly or through contractual, licensing, or other arrangements.

mas be notified of their rights under M.G.L. c. 71B (Chapter 766).

B. That inmates at these facilities who are under twenty-two, without high school diplomas, and who so desire be referred, or continue to be referred, by the Sheriffs of these facilities to the school committee having jurisdiction over them for evaluation and possible preparation of IEP's. The state defendants shall assist the Sheriffs in this task generally, and shall take appropriate action to insure that local school committees carry out their obligations under Chapter 766 and Department of Education regulations.

C. That the state defendants provide forthwith, in cooperation with the Sheriffs of the Franklin and Hampshire County Houses of Correction, appropriate special education services to any inmate entitled to special education services in accordance with the terms of the inmate's IEP.

D. That the state defendants submit to this Court in thirty days a proposal for resolving the underlying state law issue under M.G.L. c. 127 § 48, that is, upon whom the legislature has placed initial or primary responsibility for the delivery of special education services to inmates at the County Houses of Correction.

E. That the state defendants complete as soon as possible the Request for Proposals for the Fiscal Year 1982 special/adult education grants and distribute it to the appropriate County Houses of Correction so that they may apply for the proposed grants.

F. That all the terms of this injunction be acted upon in a manner which gives due regard to the security needs of the correctional facilities involved, and to the extent possible, that the provision of services by the state defendants take place in the context of existing educational programs at the Hampshire and Franklin County Houses of Correction.

G. That the state defendants, the Sheriff of the Franklin House of Correction, and the Sheriff of the Hampshire House of Correction file reports within forty-five days with this Court and plaintiff's counsel relating the manner in which they have undertaken to fulfill the terms of this preliminary injunction, problems they have encountered, and proposals to remedy those problems. Said reports may include affidavits concerning the number of inmates involved; statements on the outlook for a long-range solution to the problem of delivering special education services to inmates at these facilities; and proposals for amendment or alteration of this preliminary injunction.

### F. Dismissal of Sheriffs Ashe and Massimiano

39. F.R.Civ.P. 19(a)(1) provides for joinder of a party subject to service of process "if in his absence complete relief cannot be accorded among those already parties." The provisions of this rule have been liberally construed in this district and the First Circuit. *Harris v. White*, 479 F.Supp. 996 (D.Ma.1979), *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Ma.) *aff'd* 509 F.2d 580 (1st Cir. 1974).

40. Because of the nature of the preliminary injunction to be entered in this case, it is clear that Sheriff John Boyle of the Hampshire County House of Correction and Sheriff Donald McQuade of the Franklin County House of Correction are necessary parties to accord complete relief in this action.

41. However, because the inmates at the Hampden and Berkshire Houses of Correction are receiving the services to which they are entitled and no controversy regarding those facilities remains before this Court, the presence of Sheriffs Ashe and Massimiano in this suit is no longer necessary and their motions to dismiss shall be allowed.