Department of Education v. Manchester  CV-94-573-M   03/21/96

UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


New Hampshire Department of Education; and
New Hampshire Department of Corrections,
     Plaintiffs,

     v.                                          Civil No. 94-573-M

City of Manchester, NH School District;
and Marc Adams,
     Defendants.


                          O R D E R


     Plaintiffs, the New Hampshire Department of Education and

the New Hampshire Department of Corrections (collectively, the

"State"), appeal a final administrative order issued pursuant to

the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400, et seq.  Defendants, the City of Manchester School

District (the "School District") and Marc Adams, seek an order

affirming the hearing officer's rulings.  They also seek an award

of attorney's fees under 42 U.S.C. §1415(e) and New Hampshire

common law.


                        **Background**

     Defendant Adams is a state prison inmate who previously

resided in Manchester, New Hampshire.  Before dropping out of the

Manchester school system, he had been identified as both

emotionally handicapped and learning disabled.  In 1991, Adams

was implicated in the death of a three year old girl, and in July

of that year he pled guilty to a related charge of manslaughter. He was sentenced to a term of 15 to 30 years in the New Hampshire State Prison.  At that time, Adams was 20 years old.

In February, 1992, Adams requested a due process hearing under the IDEA, asserting that he was entitled to, but was not receiving, a "free and appropriate" education at the prison.  The matter was scheduled for hearing in late 1992.  On December 16 of that year, before the due process hearing was held, the parties executed a settlement agreement, which hearing officer S. David Siff then entered as his final order (the "Stipulated Order"). That order provided that the School District (with input from the State) would develop an Individualized Education Plan ("IEP") for Adams for each year of a two-year compensatory education program and that the State would implement the IEP at the prison.

An IEP was eventually developed that provided, among other things, that Adams would receive a minimum of 5.25 hours of daily instruction and counselling.  Initially, the State dutifully delivered the required educational services and otherwise implemented the IEP at the prison.  Subsequently, however, both Adams and the School District requested another due process hearing.  They alleged that the State was no longer honoring its obligations under the Stipulated Order, and they sought an order "compelling the State Departments to implement the IEP by

allowing [Adams] to take his courses in the Education Building at the State Prison <u>regardless of his classification within the prison system</u>." (Decision of hearing officer John LeBrun on Motion for Directed Verdict at 1 (July 14, 1994) (emphasis added))[1]

Hearing Officer John LeBrun presided over the requested due process hearing, at which the State presented evidence and called several witnesses. In his preliminary order dated July 14, 1994, the hearing officer made numerous findings of fact, many of which appear to be undisputed. The facts relevant to this proceeding are summarized as follows.

The New Hampshire State Prison employs a sophisticated classification system to categorize inmates by types relevant to its penological goals. After an initial evaluation, inmates at the prison are placed in one of three categories: C-3 (medium security risk prisoners); C-4 (higher security risk prisoners); or C-5 (maximum security risk prisoners). Those inmates classified as C-5 are segregated from the general prison

---

[1] Curiously, as discussed more fully below, the parties and the hearing officer treated the Stipulated Order as a settlement agreement, the terms of which the State had allegedly breached. Accordingly, the subsequent due process hearings proceeded, essentially, as a contract enforcement action rather than a traditional IDEA proceeding (at which the hearing officer examines the appropriateness of a student's IEP and the procedures employed in developing that IEP).

3

population and housed in a secure housing unit, known as SHU.[2] Each C-5 inmate is housed in a separate cell and receives a maximum of one hour in the day room and one hour of outdoor recreation each day. C-5 inmates are not permitted to mingle with prisoners in the lower classifications, nor are they permitted to leave SHU except under exceptional circumstances, such as medical emergencies. When they do leave SHU, C-5 prisoners are always accompanied by two correctional officers and restrained in handcuffs and leg irons. While prisoners in the general population are reviewed for possible reclassification at least every 6 months, those housed in SHU are reviewed for reclassification at least every 90 days.

Prior to entry of the Stipulated Order, Adams had been housed in SHU on several occasions, either because he had been classified as a C-5 inmate or because his inmate classification was pending administrative review. By the time his IEP was drafted, Adams was classified C-4 and was in the general prison population. Although he had previously been confined in SHU, neither the Stipulated Order nor the IEP addressed how (or even if) the IEP would be implemented should Adams again be placed in SHU.

---

[2] Prisoners classified at lower security risk levels, e.g. C-1 (participants in halfway house and work release programs) and C-2 (minimum security), are not housed at the prison.

4

In September, 1993, it appears that prison officials questioned the propriety of Adams' C-4 classification and considered upgrading him to C-5. However, because the Warden doubted the prison's ability to fully implement Adams' IEP if his status were changed from C-4 to C-5, Adams' classification was not upgraded at that time. In fact, the hearing officer found that "the Warden specifically bent over backwards in order to assist [Adams] in not reclassifying him in September." (July 14 Order at 6) Subsequently, however, in November, 1993, Adams' behavior resulted in his reclassification. He was again designated a C-5 inmate and moved into SHU. The hearing officer found that in the 90 days preceding his reclassification, Adams managed to accumulate 9 disciplinary citations. He pled guilty to each citation, at least one of which involved a very serious matter (encouraging other inmates to stab correctional officers).

While housed in SHU, Adams was not provided the 5.25 hours of daily instruction called for by his IEP. He did, however, participate in certain educational programs and he met with an instructor once each week, at which time he reviewed prior assignments and received new assignments to be completed in his cell. At the due process hearing, the State took the position that when Adams was reclassified to C-5 status, the IEP was of necessity, albeit implicitly, modified. It argued that due

primarily to legitimate security concerns (and secondarily, because of constraints imposed by limited fiscal, physical plant, and staff resources), it was unable to fully implement the IEP while Adams was confined in the Secure Housing Unit.

The Stipulated Order previously discussed provides for modification of the IEP when circumstances warrant: "The City of Manchester School District shall develop an Individualized Education Plan (I.E.P.) for Marc [Adams], with such modifications as may become necessary." Stipulated Order para. 1 (emphasis added). The hearing officer faulted the State for failing to seek to modify the IEP once Adams was reclassified as a C-5 inmate. He found that instead of seeking a modification, the State unilaterally determined it could no longer implement the IEP as drafted and simply chose to educate Adams based on a home study model program while he was in SHU. (That program was not approved by the State Department of Education as a "home based program.")[3]

_____

[3] The hearing officer found that "[i]n September of 1993, [counsel for Adams] requested that the team reconvene to address the issue of [Adams'] change in placement, and no meeting was ever set up. Mr. Norris' [Educational Consultant for the Department of Education] explanation was that `it was a lack of follow-through I guess.'" Order dated July 14, 1994, at 16. However, based upon the allegations set forth in the complaint and the defendants' answers to those allegations, it appears that the Department of Corrections did contact the School District in November, 1993, as soon as Adams was placed on C-5 status. The parties did not, however, make any effort to modify the IEP. The School District claims that, notwithstanding his elevation to C-5

6

Throughout his imprisonment, Adams has been moved in and out of SHU, depending upon his behavior and security risk assessments. While classified as a C-4 inmate, he appears to have been provided with the educational program described in his IEP. When housed in SHU, however, the parties agree that he was not. William McGonigle, Education Director at the Department of Corrections, agreed before the hearing officer that the State had not fully implemented the IEP (because of Adams' periodic incarceration in SHU). McGonigle conceded that because the IEP must be "fully implemented" before the two-year period of compensatory education begins to run, and because the IEP requires continuity in Adams' education (to avoid regression during periods of no instruction), the State conceded that it had not yet begun to provide the two years of compensatory education called for in the Stipulated Order.

The hearing officer concluded that the State had not fulfilled its obligations under the Stipulated Order. Specifically, he ruled that the State failed to provide Adams with 5.25 hours per day of direct educational services as required by the IEP while he was housed in SHU. Additionally, he concluded that the State Department of Education failed to

status, because Adams' educational needs had not changed, there was no reason to modify the IEP. See School District's Answer, paras. 29-31.

7

monitor or enforce the Department of Corrections' implementation of the IEP. Accordingly, at the close of the State's evidence, the hearing officer granted the "motion for a directed verdict" submitted by Adams and the School District.

After reconvening the parties and taking additional evidence, the hearing officer issued his final administrative order, in which he granted 14 of Adams' 15 requests for relief and made the following findings and rulings:

> [T]he IEP as written can be carried out for Marc [Adams] in SHU if the Department of Corrections makes necessary changes in SHU so as to accommodate Marc's needs. Those are set forth in Paragraph 9, Sub-paragraphs A through H of the requested relief.
>
> With respect to the second question, although the Hearing Officer rules that the IEP can be implemented in SHU if the necessary changes are made, in the event that the Department of Corrections does not make said changes, it is hereby ordered to permit Marc to participate in the Adult Education Center Program (i.e., the General Education Center) if he is housed in SHU either temporarily or through a reclassification.
>
> With respect to the third question, the compensatory education issue is resolved in favor of Marc A. and is specifically addressed in Paragraphs 1, 2 and 3 of the Request for Relief. Marc A. is clearly entitled to the two years of compensatory education already agreed-upon between the parties in the Final Order Approving Settlement, dated December 16, 1992, and is further entitled to an additional period of compensatory education described in Paragraphs 2 and 3 of the Requested Relief.

Final Order of Hearing Officer LeBrun (Oct. 16, 1994), at 17. The hearing officer then directed the State either: (1) to design

8

and implement an "approved program" for providing Adams with the IEP while he was in SHU;[4] or (2) if such a program could not be implemented in SHU, permit Adams to leave SHU each day (with appropriate security escorts) so that he might participate in the Adult Education Center Programs conducted elsewhere at the prison.

The State argues that it cannot, consistent with its legitimate penological requirements, comply with the hearing officer's order. First, like any other C-5 inmate, Adams cannot safely be permitted to leave SHU for 5.25 hours each day, so educating him at the Adult Education Center with general

---

[4] The hearing officer provided that if the prison elected to implement the IEP in SHU, it must meet several "minimum criteria," including the creation of a separate area within SHU to be used as a classroom for Adams and other educationally handicapped students, the designation of a separate study area within SHU for such students, and the provision of interactive audio and/or video equipment so that Adams might have "access" to other students when receiving daily instruction in courses where more than one student is normally present. Paragraph 9 of Adams' request for relief (which the hearing officer granted).

Curiously, however, earlier in his order the hearing officer appears to have found that the State could not possibly meet any of these criteria, noting that: "With respect to the issue of interactive video/television systems, Mr. Sokolow is of the opinion that this could not possibly be implemented in SHU in that any equipment would be destroyed by the inmates. He described the situation where wiring had been ripped out of walls, etc. On cross-examination it became clear that there is no present availability with any of the rooms in the SHU structure for education to be provided to any inmate 5 1/4 hours per day. It also became clear that the interactive video/television is not viable." Order at 14 (emphasis added).

9

population inmates is simply not feasible. And, with regard to the implementation of an "approved program" (subject to the qualifications mandated by the hearing officer) in SHU, the State claims that it cannot, consistent with its obligations to maintain security and discipline and preserve the rights of other inmates, allocate separate areas for teaching and study, or provide Adams or other C-5 inmates with access to interactive audio/video equipment.

The State's position here is seemingly straightforward. It argues that regardless of the terms of the Stipulated Order, the hearing officer was simply without jurisdiction to issue a subsequent enforcement order which directly conflicts with and undermines the prison's legitimate security, disciplinary, and inmate classification procedures. The nature of the dispute, then, can be framed as follows: When society's laudable goal of providing a free and appropriate education to every handicapped child squarely conflicts with its at least equally legitimate need to maintain safety, security, and discipline in its prison facilities, which interests should prevail?

If, for example, the State is required to educate Adams for 5.25 hours each day outside the confines of SHU, its ability to provide a secure and stable environment within the prison walls will necessarily be compromised to some degree. Moreover, its

10

ability to discipline Adams, in an effort to control his dangerous and threatening behavior (like his apparent efforts to enlist other inmates to stab corrections officers) would also likely be undermined. The deterrent effect of possible reclassification to level C-5 and confinement in SHU for violations of legitimate prison regulations would be significantly eroded if an IEP's inconsistent provisions, developed by educators unschooled in prison administration, could operate to nullify the prison's legitimate rules. In response, the School District and Adams argue that the prison administration should have taken these factors into account before agreeing to the entry of the Stipulated Order and conceding, in substance, that the IDEA's requirements take precedence over the State's penological concerns.

No party disputes the fact that the IDEA applies to qualified prison inmates. Alexander S. v. Boyd, 876 F.Supp. 773, 800 (D.S.C. 1995); Donnell C. v. Illinois State Bd. of Educ., 829 F.Supp. 1016, 1020 (N.D. Ill. 1993); Green v. Johnson, 513 F.Supp. 965, 976 (D.Ma 1981); 34 C.F.R. §300.2(b)(4). See also Nashua School Dist. v. New Hampshire, ___ N.H. ___, 667 A.2d 1036, 1040 (1995) ("a school district is responsible for the development of an individualized education plan for educationally disabled students between the ages of eighteen and twenty-one who are incarcerated at the prison.") (citing N.H. Rev. Stat. Ann.

11

ch. 186-C:19-a). In fact, the State concedes that Adams is entitled to a "free and appropriate education" while in its custody. The difficult question which the parties seem unable to resolve is whether Adams' entitlement under the IDEA to a free and appropriate education can be accommodated while he is housed in the Secure Housing Unit, without undermining the State's ability (and, indeed, its responsibility) to maintain discipline and provide a safe and secure environment inside the prison walls.

### Standard of Review

A parent who is dissatisfied with a child's IEP may challenge it by demanding an impartial due process hearing before the state educational agency. 20 U.S.C. § 1415(b)(2). Any party aggrieved by the decision of the hearing officer may ask for further review by an appropriate federal district court. 20 U.S.C. § 1415(e)(2). The district court will review the administrative record, hear additional evidence if requested by a party, and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id. The court of appeals for this circuit has described the applicable standard of review in these cases as an "intermediate" one.

> [T]he [IDEA] contemplates an intermediate standard of
> review on the trial-court level -- a standard which,

12

> because it is characterized by independence of
> judgment, requires a more critical appraisal of the
> agency determination than clear-error review entails,
> but which, nevertheless, falls well short of complete
> de novo review. . . . In the end, the judicial
> function at the trial-court level is `one of involved
> oversight' and in the course of that oversight, the
> persuasiveness of a particular administrative finding,
> or the lack thereof, is likely to tell the tale.

Lenn v. Portland School Committee, 998 F.2d 1083, 1086-87 (1st Cir. 1993).

This case, however, does not come before the court in the usual procedural posture. This is not the ordinary appeal from a hearing officer's findings and rulings concerning the appropriateness of a particular educational regimen or placement. Instead, it is a case cloaked in the form of an IDEA appeal, but which the parties (and the hearing officer) have apparently treated as turning on issues customarily associated with actions in contract. No party directly challenges the IEP developed for Adams. In fact, the hearing officer did not even address the propriety of the IEP. Instead, the parties focus attention on the terms of the Stipulated Order and the obligations which each side claims the State either did or did not undertake upon agreeing to the entry of that order.[5]

---

[5] Adding to the confusion is the fact that the record of the proceedings before the hearing officer is not entirely complete and all parties agree that its general reliability is questionable. The transcription is generally suspect and, due to an apparent malfunction in the tape recording device employed, a

13

The School District and Adams argue that the hearing officer's order construing and enforcing the Stipulated Order should be affirmed. The State, on the other hand, raises several contract-like defenses in support of its claim that the hearing officer's order should be vacated. First, the State asserts that even if the Stipulated Order could be construed to require the State to implement Adams' IEP while he is housed in SHU, it must be viewed as unenforceable — the product of mutual (or, at a minimum, unilateral) mistake. The State contends that when it agreed to the entry of the Stipulated Order, all parties (and certainly the State) assumed that Adams would remain on C-4 status during the implementation of the IEP and, further, all parties understood that the IEP as drafted could not be implemented in SHU.

Next, it claims that to the extent the hearing officer's interpretation of the Stipulated Order is correct, it is unenforceable as being against public policy. Finally, the State argues that even if it is literally obligated to comply with the Stipulated Order and implement the IEP when Adams is classified C-5, it should be excused from performing that obligation because Adams' own voluntary misconduct (i.e., misbehavior resulting in

---

portion of the April 19, 1994, hearing (during which the Warden apparently testified regarding security issues) cannot be transcribed.

reclassification as a C-5 inmate) has made it impossible for the State to implement the IEP as written.  Stated somewhat differently, the State apparently views the Stipulated Order as a contract between the parties (but of course one which was entered as an administrative order by the original hearing officer) and claims that Adams has breached his obligations of good faith and fair dealing implicit in all contracts governed by New Hampshire law.  The State argues that Adams' breach is a material one and, therefore, operates to relieve the State of its own performance obligations under the agreement (order).

The judicial review mechanism provided by the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).  On the other hand, courts should be very hesitant to enforce a hearing officer's administrative order if, as here, it appears that insufficient deference was given to the legitimate security and penological interests of prison administrators.  As the Supreme Court has repeatedly held, courts (and, by analogy, administrative hearing officers) should not "substitute [their] judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison."  O'Lone v. Estate of

15

<u>Shabazz</u>, 482 U.S. 342, 353 (1987) (quoting <u>Block v. Rutherford</u>, 468 U.S. 576, 588 (1984)).

**Discussion**

The issue presented in this case is not whether Adams is entitled to a free and appropriate education while incarcerated at the New Hampshire State Prison; it is clear (and the State does not dispute) that he is. Rather, the issue is whether Adams is entitled to <u>the specific educational program described in the IEP developed in early 1993</u>, which, as construed by the hearing officer, calls for 5.25 hours of daily instruction, whether Adams' misbehavior causes him to be reclassified to C-5 status and confined in SHU from time to time or not.

A. <u>Traditional IDEA Review</u>.

Reviewing the hearing officer's orders of July 14 and October 6, 1994, under the established "intermediate" standard of review, it seems clear that they must be vacated. The hearing officer simply failed to accord any weight much less sufficient weight to the legitimate and substantial security concerns of the State when he determined that the IEP must be enforced as written, notwithstanding Adams' periodic status changes.[6]

---

[6] No party questions the legitimacy under the applicable regulations of Adams' reclassifications to C-5 status, and no party seriously contends that Adams is mentally incompetent to a degree adequate to relieve him of responsibility for his own

16

In a usual IEP appeal a district court engages in a two-step inquiry. First, it determines whether the parties complied with the procedures set forth in the IDEA. Then, it determines whether the educational program developed through those procedures is reasonably calculated to enable the handicapped child to receive educational benefits. Rowley, 458 U.S. at 206-07; Roland M. v. Concord School Committee, 910 F.2d 983, 990 (1st Cir. 1990), cert. denied, 499 U.S. 919 (1991). This case is different in that, even assuming both conditions have been met and Adams' IEP complies with the IDEA's requirements (issues which were not addressed in the administrative orders presently before the court), the IEP at issue here impacts other competing social interests: maintenance of secure prisons and proper execution of criminal sentences.

The court cannot ignore the realities of this case. First, Adams pled guilty to and was convicted of a very serious criminal offense, resulting in his incarceration at the state prison. While incarcerated, he has repeatedly engaged in misconduct, violating valid and legitimate prison regulations. As a result of his conduct, he has periodically been reclassified to C-5 status, which carries with it a higher than normal level of security and control, and which does not easily accommodate an

actions.

17

educational plan that demands comparatively little control and less security.

At the outset it should be recognized that the tail of Adams' IEP cannot wag the dog of his prison sentence, nor can it serve to exempt him from legitimate administrative and disciplinary systems in place within the prison. Stated somewhat differently, Adams is not entitled to an IEP which effectively insulates him from prison discipline and control, particularly if a different IEP could be developed which might serve both his educational needs and the prison's valid security and disciplinary interests, or at least one that did not undermine legitimate penological interests.

Plainly, some effort must be made by the parties and, if necessary, by experts in the fields of education and penology, to balance their valid but to some degree mutually exclusive interests. Here, in determining the State's obligations under the IDEA, the administrative hearing officer seemingly limited considerations to only educational interests, and made no effort at all to recognize or accommodate the State's legitimate penological interests. He attempted to strike no balance between the competing legitimate interests at stake. Accordingly, the court cannot conclude that the administrative relief ordered by

18

the hearing officer was "appropriate." 20 U.S.C. § 1415(e)(2). His orders must, therefore, be vacated.

B.    New Hampshire Contract Law.

As noted above, the parties have treated this case as one of contract interpretation under New Hampshire law. They have not, however, cited any pertinent authorities to suggest that this matter is appropriately before the court as, essentially, an action to enforce a settlement agreement. Nevertheless, following their lead for the moment, the court will briefly address the issues in the context imposed by the parties. See Appeal of Dell, ___ N.H. ___, 668 A.2d 1024, 1029 (1995) (holding that a consent order or settlement agreement is contractual in nature). Turning to the Stipulated Order as a contract, it is apparent that several legal and material factual issues are in dispute (or have not been addressed).

First, there is the question of the hearing officer's jurisdiction (and this court's) to enforce a contract entered into by non-diverse parties. Even if the court were inclined to view the Stipulated Order as a settlement agreement and was persuaded that it had jurisdiction to enforce the terms of such a contract, it is clear that the parties disagree as to the proper interpretation of the State's obligations under that contract. Adams and the School District contend the agreement's terms are

19

clear and their meaning plain: By signing the Stipulated Order, the State agreed to fully implement the IEP, regardless of Adams' inmate status and regardless of its impact upon prison security interests, disciplinary concerns, programs, or allocation of resources. Defendants seem to concede no limit on the State's obligation to implement the current IEP as written.

In response, the State suggests that, at least implicitly, it agreed to implement the IEP only to the extent implementation would not unduly interfere with its legitimate and overriding penological concerns. Public policy, the State says, demands no less. Dangerous prisoners cannot use an IEP as a "free pass" to avoid legitimate penological restrictions and roam the general population. Nor can a prisoner's IEP operate, without regard for penological concerns, to require the prison to (a) assign personal guards to escort such a prisoner to, during, and from his educational classes, (b) restructure its disciplinary programs, or (c) substantially reconfigure its physical plant simply to accommodate that inmate's current IEP, at least not when the IEP can be appropriately modified to satisfactorily address all competing interests. This is particularly true when the inmate's own deliberate and volitional misconduct results in his removal from the general population, thereby frustrating the prison's efforts to deliver the educational program described in the IEP.

20

In light of the parties' hopelessly conflicting interpretations of the Stipulated Order and the absence of clarity on the points in contention, the court, if it viewed that document as a contract, would likely find that its terms are ambiguous as a matter of law. See, e.g., In re Navigation Technology Corp., 880 F.2d 1491, 1495 (1st Cir. 1989) ("the general rule is that whether a contract is clear or ambiguous is a question of law . . . If the contract is deemed to be ambiguous, then the intention of the parties is a question of fact."); Laconia Rod & Gun Club v. Hartford Accident and Indemnity Co., 123 N.H. 179, 182 (1983) (a contract is ambiguous "when the contracting parties reasonably differ as to its meaning."). Obviously, resolution of the dispute would then necessarily turn upon resolving factual disputes. See, e.g., R. Zoppo Co. v. City of Dover, 124 N.H. 666, 671 (1984) (in order to resolve ambiguities in a contract, the court must consider "the situation of the parties at the time of their agreement and the object that was intended thereby, together with all provisions of their agreement taken as a whole.").

And, if the court were required to resolve the State's claims of mutual or unilateral mistake, additional evidence and testimony surely would be required to determine whether the parties did (or should have) considered the fact that Adams would likely be classified as a C-5 inmate at some point during

21

implementation of the IEP.  Moreover, even if the court were to interpret the "contract" in the manner suggested by Adams and the School District, yet another question presents itself:  Whether Department of Corrections Commissioner Powell had legal authority to enter into a contract binding the State to terms that directly conflict with the State's legitimate penological regulations and security policies (if, in fact, they do); that is, whether his commitment was _ultra_ _vires_ to the extent the hearing officer's broad construction of the State's obligations under the Stipulated Order is correct.

Finally, the State persuasively argues that the hearing officer has, at a minimum, interpreted the Stipulated Order in a manner that wholly disregards the prison's legitimate security concerns and, even if his interpretation accurately reflects the "contract's" provisions, it is necessarily void as being contrary to public policy.  That is, even assuming that the hearing officer's interpretation of the Stipulated Order (as a contract) is correct and consistent with the parties' original intent, and even assuming he had jurisdiction to resolve contractual disputes arising from IDEA settlement agreements, that "contract" may still be unenforceable.  _See, e.g._, _Gormly v. I. Lazar & Sons, Inc._, 926 F.2d 47, 49 (1st Cir. 1991) (citing Rhode Island law for the proposition that, "No principle of law is better settled than that a party to a contract that is contrary to public policy

22

cannot come into a court of law and ask to have it enforced for his benefit."); <u>Technical Aid Corp. v. Allen</u>, 134 N.H. 1, 17 (1991) (contracts against public policy are void and unenforceable).[7]

At this juncture, however, the court need not wade into these complex factual and legal questions. The Stipulated Order, as entered by the Department of Education hearing officer as part of the initial administrative due process proceeding, <u>is</u> an administrative order, as are the subsequent enforcement orders, which orders are subject to judicial review under the IDEA. Accordingly, the court will consider this matter as an appeal under the IDEA of administrative orders entered and construed by an administrative hearing officer.

---

[7] Even assuming that the hearing officer had jurisdiction to construe and enforce what the parties view as a settlement contract, and assuming he properly interpreted that agreement, his final order essentially demands that the State release Adams from the usual restrictions and controls of the prison system simply because it wittingly or unwittingly "agreed" to do so. However, the legitimate and substantial security concerns expressed by the State (and not seriously questioned by defendants) mandate that the court resolve the parties' dispute in a more reasoned and measured fashion. Simply stated, the substantial public policy concerns associated with maintaining a safe, secure, and disciplined prison environment would seem to militate strongly against affirming the hearing officer's orders to the extent those orders fail to take such important matters into account and fail to strike a reasonable balance between those legitimate interests and Adams' educational entitlements.

23

The initial Stipulated Order in this case clearly provides that the School District "shall develop an Individualized Education Plan (I.E.P.) for Marc [Adams], with such modifications as may become necessary, for each year of his compensatory education program." (Stipulated Order, para. 1 (emphasis added)) The parties have not focused on the highlighted clause, which appears to be neither vague, ambiguous, nor unenforceable as violative of public policy. The clause seems to have provided an effective vehicle for making whatever modifications in Adams' IEP circumstances might require. In light of Adams' relatively frequent misbehavior and resulting periods of confinement in SHU, and the State's seemingly credible position that it cannot implement the IEP as presently drafted while Adams is confined as a C-5 inmate, circumstances would plainly seem to call for modifying the IEP.

The court is, however, hesitant to impose a global judicial resolution of this problem without first giving the parties an opportunity to bring their respective expertise to bear on it. Judges are not particularly expert in either educational programming or prison administration and the issues here are complex. Their resolution calls for a reasonable balance to be struck between appropriate education of the handicapped and safe and appropriate operation of a correctional facility. The parties are certainly in a better position, at least initially,

to develop an appropriate IEP for Adams which takes into consideration factors within their particular areas of educational and penological expertise.

Accordingly, the parties are hereby directed to develop a new proposed IEP for Adams. In the course of doing so, they shall consider, among other things, the following:

1. That Adams is entitled to a free and appropriate public education while incarcerated at the State Prison;

2. That Adams' newly developed IEP proposal must take into consideration the legitimate security and other penological concerns of the State, including those relating to the housing and disciplining of dangerous inmates;

3. That Adams is presumed to be sane and capable of understanding prison policies and comporting his behavior with prison regulations.[8] If Adams' prison behavior warrants discipline (including reclassification as a C-5 inmate), the revised IEP should not operate to thwart the prison's legitimate need to preserve order and discipline among inmates; and

4. That flexibility and a willingness to accommodate will be required of all parties in order to meet the IDEA's requirements and Adams' particular needs.

---

[8] See, e.g., N.H. Rev. Stat. Ann. 464-A:8, IV, providing that under state law individuals are presumed to be sane and competent, until proven otherwise, beyond a reasonable doubt. Based upon the record presently before the court, it does not appear that Adams has ever claimed that he is legally insane or otherwise not accountable for his own actions while incarcerated.

## Conclusion

Qualifying inmates are entitled to a free and appropriate public education while incarcerated. However, legitimate prison regulations aimed at maintaining a safe, secure, and disciplined inmate population cannot be nullified or substantially undermined by an inmate's current IEP which can only be implemented at such a cost. Legitimate prison interests must be accorded significant deference and the IEP must be modified to the extent possible, with a view toward striking the appropriate balance necessary to vindicate both penological and educational interests to the extent those interests can be reconciled and harmonized.

The parties are ordered to engage in good faith efforts to develop appropriate modifications to Adams' current IEP, in a manner that is consistent with the terms of this order. The parties shall file a status report with the court on or before June 15, 1995. If, by that date, they have been unable to agree upon an appropriate joint proposal for modifying Adams' current IEP, the court will consider appointing an expert (or experts) and/or a master at the parties' expense to recommend an appropriate IEP, taking into account the need to strike a reasonable balance between the prison's legitimate penological interests and Adams' educational entitlement. See e.g. Fed. R. Evid. 706. Accordingly, the court will retain jurisdiction over

26

this matter pending development (whether by agreement or by subsequent court order) of a modified IEP for Adams.

At this juncture, no award of attorneys' fees is appropriate, see 20 U.S.C. §1415(e)(4)(B), and each party shall bear its own costs and fees associated with pursuing this matter. The court will re-evaluate the attorneys' fees issues after the matter is resolved on the merits.

The orders of the hearing officer dated July 14 and October 6, 1994, are hereby vacated. The School District's motion for summary judgment (document no 19) is denied. Adams' motion to dismiss or for other relief (document no. 22) is denied. The State's motion to strike or dismiss counterclaims for attorneys' fees (document no. 11) is denied as moot. The State's motion for summary judgment (document no. 25.2) is, to the extent it seeks an order vacating the hearing officer's orders, granted. In all other respects, the State's motion for summary judgment is denied.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

March 21, 1996

cc:  Nancy J. Smith, Esq.
     Peter S. Smith, Esq.
     Dean B. Eggert, Esq.