**Thomas STRACHAN, Plaintiff,**

v.

**Michael J. ASHE, Nick Fiorentino, William De Maio, James Moores, and John Doe, Individually and in their official capacities, Defendants.**

Civ. A. No. 79–2001–F.

United States District Court,
D. Massachusetts.

Oct. 13, 1982.

---

John M. Thompson, Prisoners Legal Assistance Clinic, Western New England College School of Law, Springfield, Mass., for plaintiff.

Savino J. Basile, Santaniello, Posnik & Basile, J. David Keaney, Edward J. McDonough, Jr., Springfield, Mass., for defendants Fiorentino and Ashe.

## MEMORANDUM

FREEDMAN, District Judge.

This action is before me following a hearing on the plaintiff's motion for class certification, F.R.Civ.P. 23, and for partial summary judgment, F.R.Civ.P. 56. Herein I set forth my reasons for denying plaintiff's class certification motion and for allowing his motion for partial summary judgment.

### I.

Plaintiff Thomas Strachan was an inmate at the Hampden County (Massachusetts) House of Correction ("HCHC") and confined in a so-called "hospital isolation cell" when this action was filed on October 2, 1979. In his initial complaint, plaintiff alleged that he was confined in hospital isolation pursuant to constitutionally defective procedures and that the conditions of his confinement violated his rights under the federal constitution and applicable state regulations. Plaintiff sought declaratory and injunctive relief as well as damages against five defendants named individually and in their official capacities.[1] Following an *ex parte* hearing on plaintiff's application, I entered a temporary restraining order on October 3, 1979 ordering plaintiff's release from the hospital isolation cell and from disciplinary isolation status.

On October 22, 1979, counsel filed an answer on behalf of two of the five defendants named by plaintiff—Michael J. Ashe, Sheriff of Hampden County, and Nick Fiorentino, Deputy Master of the Hampden County House of Correction.[2] Discovery ensued, and in March 1980 plaintiff sought and was granted leave to file an amended complaint which in essence reiterated the allegations of the initial complaint, but through the addition of three paragraphs expanded the claims of plaintiff for declaratory and injunctive relief to claims on behalf of a class of "persons who were on September 18, 1979, are now or will be imprisoned in the Hampden County House of Correction." Amended Complaint, ¶ 10. Defendants Ashe and Fiorentino did not answer these amended allegations.

In August 1980 plaintiff moved for class certification and the matter was referred to a magistrate. The magistrate recommended denial of the motion, but upon plaintiff's seasonable objections I rejected the magistrate's recommendation and ordered that a hearing be scheduled. *See* 28 U.S.C. § 636(b). Thereafter, the plaintiff moved for partial summary judgment on his individual claim for damages, and the case came forward for a hearing on both motions on June 4, 1982.[3] At the close of the hearing, I indicated that I would leave

1. Plaintiff named one defendant as "John Doe." Although plaintiff has apparently discovered the name of this defendant subsequently, *see* Deposition of Defendant Fiorentino at 31, plaintiff has not sought substitution of this party.

2. None of the remaining three defendants has appeared or answered; neither has plaintiff pursued the entry of default against those other defendants.

3. At the hearing, plaintiff raised an argument concerning his motion to strike two affidavits filed by defendants on May 28, 1982 after I had allowed their motion for leave to file opposition to plaintiff's summary judgment motion late on May 27, 1982. Plaintiff's counsel asserted, *inter alia,* that the affidavits should not be considered inasmuch as they dealt with the good faith of defendants, an affirmative defense which defendants had failed to plead. *See Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Defendants' counsel argued that the good faith issue had been raised,

and further indicated that defendants would move for leave to file an amended answer answering the allegations of plaintiff's amended complaint and asserting a good faith defense. Defendants did so move on June 10, 1982.

With respect to the allegations of the amended complaint which defendants now seek to put in issue, I am unable to find grounds of "excusable neglect," F.R.Civ.P. 6(b), to allow the filing of an amended answer at this late date. Defendants' counsel was well aware of the amended complaint and failed to answer. The references in defendants' motion to "present counsel" and "other counsel" are unavailing, moreover, since the record contains no indication that defendants' initial counsel has disappeared in accordance with local rules. *See* Local Rules of the United States District Court, District of Massachusetts, Rule 7(d). However, as regards the issue of the defendants' raising the affirmative defense of good faith, I treat that issue in Section III, D, *infra.*

the record open for one week in order to permit the parties to file additional evidentiary materials, and would then take the case under advisement.

Plaintiff's allegations in both his initial and amended complaints set forth two distinct causes of action pursuant to 42 U.S.C. § 1983 as well as a pendent claim premised upon state law. On the one hand, plaintiff's individual claims appear directed towards not only the conditions under which he was confined from September 18 to October 3, 1979, but also towards the allegedly defective procedures which attended his removal from the general prison population and confinement in an isolation cell in the medical unit of HCHC. Complaint ¶¶ 13–15; Amended Complaint ¶¶ 14–16. On behalf of the class, however, the allegations of the amended complaint focus upon the "policy and practice" of the defendants of "routinely" confining prisoners under conditions similar to those experienced by plaintiff "either for disciplinary or other administrative purposes." Amended Complaint, at p. 1, and ¶ 22. However, at this juncture, plaintiff appears to have focused his individual damages claim for purposes of his motion for partial summary judgment on the issue of liability upon a claim pursuant to § 1983 for unconstitutional conditions of confinement, and I treat his claim in this way. *See* Plaintiff's Motion for Partial Summary Judgment at 5–12.

## II.

Plaintiff moved on August 29, 1980 "for an order that [this case] be maintained as a class action on behalf of a class comprised of plaintiff and all other persons similarly situated, namely, all persons who are presently or will in the future be incarcerated in [HCHC]." *Motion for Class Certification* at 1. In a memorandum in support of this motion, plaintiff asserted that the "essential point in controversy is whether the conditions in the 'hospital isolation cells' and other isolation cells at [HCHC] are such that the defendants' policy and practice of confining prisoners in them for any purpose other than response to a short-term medical

emergency violates the Eighth Amendment ban on cruel and unusual punishment." Memorandum in Support of Motion for Class Certification, at 1.

Defendants' opposition to class certification is premised upon two undisputed facts: first, plaintiff Strachan was transferred out of HCHC on August 8, 1980 and has not been incarcerated there since that time; and second, the hospital isolation in which plaintiff was confined was demolished for the purpose of reconstruction along with the other isolation cells in the medical unit at HCHC on September 2, 1980. Thus, defendants contend, plaintiff's claims for declaratory and injunctive relief became moot upon his transfer out of HCHC even before plaintiff moved for class certification, and in any event, the cells specifically complained of are no longer available for use irrespective of any "policy or practice" alleged. Plaintiff counters this latter argument by noting that the amended complaint was not directed at any particular block of cells, but rather towards the defendants' policy of confining inmates in isolation under the conditions set forth in the complaint, whether in the particular cell or area plaintiff occupied or in any other cell. To the former argument, plaintiff asserts that this case is a suitable exception to the general rule that "a litigant must be a member of the class which he seeks to represent at the time the class action is certified," *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975), such that certification may be said to "relate back" to the filing of the amended complaint. *See, id.* at 402, n.11, 95 S.Ct. at 559 n.11; *see also Gerstein v. Pugh*, 420 U.S. 103, 110, n.11, 95 S.Ct. 854, 861, n.11, 43 L.Ed.2d 54 (1975). Plaintiff cites my recent ruling in *Green v. Johnson*, 513 F.Supp. 965, 975 (D.Mass.1981) as supporting the application of the relation back exception to the facts of the case at bar.

In *Green*, a named plaintiff and two proposed intervenors sought declaratory and injunctive relief on behalf of themselves and a class of special needs, school age inmates in two Massachusetts county hous-

es of correction who were not receiving special educational benefits. Before the plaintiff's motion for class certification could be ruled upon, the claims of not only the named plaintiff but also the proposed intervenors became moot because of release from custody, attainment of age twenty-two, or receipt of a high school diploma or its equivalent. I reviewed the authority of *Sosna* and *Gerstein,* and noted that plaintiff had demonstrated the reality of the claim that the specific issue presented, namely, the provision of special educational services to school age, special needs inmates, was capable of repetition yet evading review. *Green v. Johnson, supra,* 513 F.Supp. at 974–75. Since plaintiff had demonstrated this claim, and because the circumstances of the case closely paralleled those of *Gerstein,* I conditionally certified a class notwithstanding the mootness of the claims of the named plaintiff and the proposed intervenors. 513 F.Supp. at 975–76.

■ The instant case is distinguishable from *Green* in at least two important respects. First, while this case shares a common factual thread with *Green* in that a county house of correction is involved and individual inmates may be released from custody for any one of several reasons, the additional elements of mootness because of attainment of age twenty-two or receipt of a high school diploma or its equivalent present in *Green* are absent here. Thus, I am not persuaded that plaintiff has clearly demonstrated that the claim of unconstitutional conditions of confinement in isolation cells is particularly evasive of judicial review. Second, in *Green,* the contested policy or practice of the defendants in failing to provide special educational benefits was clear. In the case at bar, while it is true that plaintiff's allegation of a "regular policy and practice of defendants ... to confine members of plaintiff's class in 'hospital

isolation' cells or similar cells under conditions the same or substantially similar to [those alleged by plaintiff]" was not answered by defendants,[4] still the undisputed fact remains that the hospital isolation cells have been demolished. To the extent that plaintiff has offered evidence of an ongoing policy or practice with respect to other cells, *see, e.g.,* Affidavit of Charles King, this proof relates to events occurring in March 1981 and presents circumstances rather different from those alleged by plaintiff. *See, id.,* at p. 2. Admittedly, unconstitutional conditions of confinement can take many forms and the existence of a specific group of cells is not a *sine qua non* of plaintiff's class claims, yet the change of circumstance occasioned by the demolition of the specific cell area in which plaintiff was confined militates against finding an established policy or practice generating claims capable of repetition yet evading review.[5]

Thus, because plaintiff's claims for declaratory and injunctive relief are clearly moot, and because I am unpersuaded that this case is a suitable exception to the general rule articulated in *Sosna, supra,* I will enter an order denying plaintiff's motion for class certification under F.R.Civ.P. 23.

### III.

In this section, I consider plaintiff's motion for partial summary judgment on the issue of the liability of defendants Ashe and Fiorentino for damages under 42 U.S.C. § 1983. In the ensuing subsections I first set forth the applicable summary judgment standards, then turn to review of the factual record in this case. Next, I determine whether the undisputed facts establish a violation of plaintiff's constitutional rights under the Eighth and Fourteenth Amendments, and finally dispose of defendants' arguments concerning the availability of a

---

4. *See* note 3, *supra.*

5. Plaintiff has submitted evidence of numerosity and adequacy of representation sufficient to satisfy the requirements of F.R.Civ.P. 23(a)(1) and (4), *see, e.g.,* Affidavit of Gary King, and Stipulation of Counsel filed June 4, 1982. However, irrespective of the issue of mootness, and given the particular circumstances germane to plaintiff's confinement in isolation, *see* Section III, B, *infra,* I also entertain some doubts as to whether plaintiff could satisfy F.R.Civ.P. 23(a)(2) and (3) if I were to reach those issues.

defense based upon qualified good faith immunity.

### A. Summary Judgment

■ F.R.Civ.P. 56(c) provides in pertinent part that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

*Id.* Thus, I must examine the affidavits and materials submitted to determine initially whether a factual issue exists, and then whether such factual issue is material to the determination of the claims or defense. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied,* 423 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). In the course of this examination, I must "indulge all inferences favorable to the party opposing the motion," *id., see also Flagship Cruises, Ltd. v. New England Merchants National Bank of Boston,* 569 F.2d 699, 701–02 (1st Cir. 1978); yet, I need not presume the existence of a genuine issue of fact where none is apparent. *Feldman v. Birger,* 205 F.Supp. 87, 89 (D.Mass.1962); *Brady v. Hearst Corporation,* 281 F.Supp. 637, 642 (D.Mass.1968).

In an action under 42 U.S.C. § 1983, a plaintiff must prove that he was deprived of a federal right by a person acting under color of state law. In this case, there is no dispute that defendants Ashe and Fiorentino were acting under color of state law; rather, the essential inquiry upon this motion is whether plaintiff has demonstrated that no genuine issue of material fact exists concerning his claim that defendants deprived him of his rights under the federal constitution. As mentioned previously, *see* Section I, *supra,* plaintiff alleged two separate claims under § 1983 in his initial and amended complaints, but for purposes of his summary judgment motion has concentrated on his claim that defendants subjected him to cruel and unusual punishment by confining him in an isolation cell in the medical unit at HCHC. Defendants in opposing plaintiff's motion contend that genuine issues of material fact exist as to whether plaintiff's constitutional rights were violated, and as to whether they are entitled to a defense based upon qualified good faith immunity from damages liability. I consider the issues of a constitutional violation and good faith immunity separately.

### B. Factual Record

In this case, the factual record consists of the pleadings and the exhibits attached thereto, the depositions of defendants Ashe and Fiorentino, the defendants' answers to interrogatories, and affidavits. Indulging all inferences favorable to the defendants, I find the following undisputed factual record emerges:

Plaintiff was an inmate at HCHC on September 18, 1979, on which date his cell was searched and contraband drugs were found. Complaint ¶ 10, Answer ¶ 10. He was summarily ordered to the "hospital isolation" section of HCHC, and upon his resistance, was forcibly placed in an isolation cell in the medical unit. He was subsequently charged with five separate acts of misconduct, as follows: 1) intoxication; 2) assault and battery on a correctional officer; 3) creating a disturbance; 4) disobeying a direct order; 5) possession of drugs and/or an intoxicating substance. Complaint ¶ 11, Answer ¶ 11. All five of these misconduct charges are listed as "Major Violations" in the "Rules, Regulations and Services" pamphlet issued to inmates at HCHC. Defendant Ashe's Answers to Interrogatories, Exhibit E, p. 6. Defendant Fiorentino's Answers to Interrogatories, Exhibit E, p. 6. (Hereafter referred to collectively as "Defendants' Answers to Interrogatories").

An "isolation log" was maintained in the hospital isolation unit, wherein guards recorded plaintiff's condition approximately

every fifteen minutes. *See* Defendants' Answers to Interrogatories, Exhibit A, Deposition of Defendant Ashe, at 32–33. Entries for the period from 11:45 a. m. on September 18 through 4:00 p. m. on September 20 record plaintiff's condition as either "quiet" or "sleeping." Defendants' Answers to Interrogatories, Exhibit A. At 4:00 p. m. on September 20, plaintiff appeared before a Disciplinary Board which had been convened to hear the charges against him. *Id.*

Following a hearing, the Disciplinary Board imposed a punishment of sixty days "hospital isolation," thirty days of which were suspended, and loss of good time. Complaint and Exhibit A ¶ 12, Answer ¶ 12. Defendant Ashe permitted an appeal from the Disciplinary Board decision and on September 25 ratified the Board's action, except with respect to the punishment which he reduced to fifty days. Complaint ¶ 15 and Exhibit C p. 2, Answer ¶ 15. During the pendency of his appeal, plaintiff was confined in the hospital isolation cell, and remained there until his release pursuant to court order on October 3, 1979. Answer ¶ 16(a); Defendants' Answers to Interrogatories, Exhibit A; Deposition of Defendant Ashe, at 66–68.

In the initial complaint filed in this action, plaintiff alleged as follows:

16. Since September 19, 1979, Mr. Strachan has been held by defendants Michael J. Ashe and Nick Fiorentino in a "hospital isolation" under the following conditions:

a. His cell contains no plumbing—toilet or running water—and he is required to discharge his bodily wastes into a bucket which is emptied every 24 hours;

b. He is permitted to leave his cell for fifteen minutes daily exercise and to wash with cold water;

c. His only bedding is a mattress which lies on the floor, one sheet, one blanket, and a pillow; his cell is inadequately heated and his food is served to him cold.

Complaint ¶ 16. Defendants Ashe and Fiorentino answered this paragraph as follows:

16. a. The defendants admit the allegations set forth in paragraph 16a of the Complaint. Mr. Strachan remained in the hospital isolation cell until October 5, 1979 [sic];

b. Any representation as to cold water exclusively is denied;

c. The defendants admit the allegations of Paragraph 16c of the Complaint except that the cell is heated with the same intensity as the entire facility and the food is served from the same source as all of the inmates receive.

Answer ¶ 16. Plaintiff further alleged that the cell in which he was confined failed to meet the standards applicable to HCHC promulgated by the Massachusetts Department of Public Health relating to beds, bedding and linens, toilet and handwashing facilities, and drinking water. Complaint ¶ 17 and 18. Defendants admitted these allegations, but stated that:

All the cells in [HCHC] were in conformity prior to May 4, 1978 and since the establishment of new standards on May 4, 1978, an architect has been retained, plans have been drawn, and renovation construction is proceeding to meet minimum requirements. The defendants further say that the minimum standards established by the Department of Corrections did not take into consideration the difficulties of fiscal appropriations; that any delay occasioned in the renovation is as a result of the inability of the defendants to obtain immediate necessary and full appropriation from the legislature of the Commonwealth.

Answer ¶ 17, *see also* ¶ 18. Finally, to plaintiff's allegation that the "inadequate conditions . . . have been brought to the attention of defendants Ashe and Fiorentino, who have refused to rectify them," Complaint ¶ 19, defendants answered as follows:

The defendants Michael J. Ashe and Nick Fiorentino deny the allegations as set out in Paragraph 19 of the Complaint. At the time of the initial isolation Mr. Stra-

chan was in an intoxicated condition with fits of violence. It is the opinion of the officers of the institution that Mr. Strachan needed medical examination and isolation. He was taken to the dispensary in the hospital portion of the institution. All of the isolation cells are similarly equipped for medical purposes rather than purposes of punishment. Answer ¶ 19.

In affidavits filed in support of his motion for a temporary restraining order and subsequently in support of his motion for summary judgment, plaintiff further described the conditions of his confinement in hospital isolation. The cell in which he was confined was approximately ten feet by ten feet with bare walls and a three-foot wide, barred door. There was no toilet or other plumbing facilities, but rather he was provided with an uncovered bucket, approximately one and a half feet high and thirty inches in circumference at the top. Although on his own initiative he was able to utilize some floor cleaner to put in the bucket when he emptied it, the cleaner did not take away the smell. A mattress lay flush on the floor, and he was provided one sheet, a blanket, and a pillow. Strachan further stated that he was not provided with items for personal hygiene, and during the period of his confinement in the hospital isolation area from September 19 through October 3, was not permitted to shower. Affidavits of Thomas Strachan.

Defendant Ashe as Sheriff of Hampden County is responsible for overseeing the enforcement and observance of laws and regulations governing HCHC, for the overall supervision of all persons employed at HCHC, and for the overall supervision, care and treatment of all persons confined there. Complaint ¶ 5, Answer ¶ 5; Deposition of Defendant Ashe at 6–9. Defendant Fiorentino as Deputy Master of HCHC is a subordinate of defendant Ashe, and is responsible for the day-to-day operations of HCHC, including enforcement and observance of all laws and regulations governing HCHC, daily supervision of all persons employed at HCHC, and the daily supervision, care and treatment of all persons confined at HCHC. Complaint ¶ 6, Answer ¶ 6. Deposition of Defendant Fiorentino at 4–7. Both Ashe and Fiorentino were fully aware and approved of the action of the Disciplinary Board in sentencing Strachan to a period of isolation in a hospital isolation cell, although Ashe did reduce the punishment from sixty to fifty days to comport with state regulations. Deposition of Defendant Ashe at 59–64; Deposition of Defendant Fiorentino at 30. Both defendants testified at their depositions that they considered isolation a proper sanction for the serious misconduct of Strachan and a punishment in the best interest of the inmate and of the institution. Deposition of Defendant Ashe at 64–65; Deposition of Nick Fiorentino at 52–53. In their deposition testimony and in answers to interrogatories, defendants stated that the hospital isolation cells were rarely used for disciplinary isolation and were regularly employed either for medical problems, including incidents where inmates exhibited suicidal behavior, Defendants' Answers to Interrogatories, 1a, or for segregation of prisoners in protective custody. Deposition of Defendant Fiorentino at 15; Deposition of Defendant Ashe at 47. At the time of Strachan's confinement, the hospital isolation cells were used as an alternative because of renovations and construction taking place in the isolation areas. Defendants' Answers to Interrogatories, 1a.

Defendants have not brought forward evidence to contradict the affidavit statements of plaintiff concerning the conditions under which he was confined, except for the filing of affidavits in which they state that "to the best of [their] knowledge" plaintiff was allowed "reasonable access" to bathing, toilet, and handwashing facilities. Of course, these affidavits cannot substitute for "personal knowledge" of specific events, such as could be provided by the guards who supervised plaintiff's confinement and made the entries in the isolation log book—entries which essentially corroborate many of plaintiff's statements about his confinement. *See* Defendants' Answers to Inter-

rogatories, Exhibit A.[6] In any event, defendants admitted in their answer that plaintiff was required to use a bucket emptied every twenty-four hours to dispose of his bodily wastes.

Finally, it is undisputed that both defendants Ashe and Fiorentino were aware of a letter sent to defendant Ashe by plaintiff's counsel in which the procedures attending plaintiff's confinement were challenged and the conditions under which plaintiff was being held were brought to their attention. Specifically, the letter stated in pertinent part, as follows:

> Our second purpose in writing is to notify you that we regard Mr. Strachan's confinement in the isolation cell in the medical unit as a clear violation of his right to be free from cruel and unusual punishment, of the Department of Corrections Standards and of the statutory standards found in Chapter 127, sections 39–41 of the Massachusetts General Laws. In particular, the cell in which Mr. Strachan is confined lacks toilet facilities, hot and cold running water, and bed and spring and an off-the-floor frame. He is furnished a bucket in which to deposit his bodily wastes, and has not been permitted to shower or shave, has not been afforded an opportunity to exercise, and does not have access to writing materials to allow correspondence with counsel.
>
> Given these conditions, it is our firm belief that if Mr. Strachan is to be punished by isolation, he must be confined to his own cell or some other more suitable location for the duration of his disciplinary sentence.

Letter from Prisoner's Legal Assistance Clinic to Sheriff Michael J. Ashe, at 2; Complaint ¶ 15, Exhibit B, Answer ¶ 15.

#### C. *Constitutional Standards*

As was stated by the Supreme Court in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978):

> The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, 'proscribe[s] more than physically barbarous punishments.' *Estelle v. Gamble*, 429 U.S. 97, 102 [97 S.Ct. 285, 290, 50 L.Ed.2d 251]. It prohibits penalties that are grossly disproportionate to the offense, *Weems v. United States*, 217 U.S. 349, 367 [30 S.Ct. 544, 549, 54 L.Ed. 793], as well as those that transgress today's "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble, supra,* [429 U.S.] at 102 [97 S.Ct. at 290], *quoting Jackson v. Bishop,* 404 F.2d 571, 579 (C.A. 8, 1968). Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards.

437 U.S. at 685, 98 S.Ct. at 2570. The meaning of the phrase "cruel and unusual punishment" must be drawn "from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101 [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (1958). Such standards are not to be assessed by subjective judgment, but may be properly ascertained by reference to "objective indicia that reflect public attitude . . .," *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), including state legislation. *Id.* at 176, 96 S.Ct. at 2926.

In assessing plaintiff's claim of deprivation of his right to be free from cruel and unusual punishment in the context of his motion for partial summary judgment, I put to one side plaintiff's allegations of procedural defects attending not only his initial confinement in the hospital isolation cell but also the imposition of the sanction of disciplinary isolation imposed upon him by the Disciplinary Board. Indeed, I assume that given the very serious nature of the five offenses with which plaintiff was charged, the sanction of confinement in isolation was appropriate under both constitu-

---

**6.** Furthermore, the deposition testimony of defendants with respect to the policies and practices governing confinement of inmates in hospital isolation cells corroborates plaintiff's account in several details. *See, e.g.,* Deposition of Defendant Ashe, at 21, 22, 23–26, 30, 37–40, 48, 54, 63–65, 68–69; Deposition of Defendant Fiorentino at 11, 12–13, 19, 20, 22, 26–28, 32.

tional and state regulatory standards applicable to inmate discipline. Finally, I do not address the propriety of plaintiff's confinement in the hospital isolation cell from the time of the discovery of contraband in his cell and his subsequent exhibition of violent and irrational behavior on September 18 until his appearance before the Disciplinary Board on September 20. Rather, I am centrally concerned with the conditions under which plaintiff was confined during the period of time after the Disciplinary Board had acted on September 20 until his release from isolation pursuant to court order on October 3.

■ Defendants concede and the undisputed factual record establishes that the hospital isolation cell in which plaintiff was confined failed to conform to applicable minimum standards promulgated by the Massachusetts Department of Public Health, see 105 C.M.R. §§ 450.101, et seq. The conditions of confinement set forth by Strachan in his affidavits are in clear violation of hygienic standards applicable to county houses of correction promulgated by the Massachusetts Department of Corrections, see 103 C.M.R. §§ 975.01 et seq. Of course, the mere failure to conform to state minimum standards does not per se establish a constitutional violation. Certainly such standards may be designed to provide conditions of incarceration far better than those constitutionally mandated, and may be promulgated not for the purpose of immediate compliance exclusively, but rather for the purpose of framing goals to be attained in the future. See, e.g., 105 C.M.R. §§ 450.113.

However, state regulations do provide a source of the "objective indicia that reflect public attitude" referred to in Gregg v. Georgia, supra, and may in fact codify previously announced constitutional standards. It is certainly significant in this case that the Department of Public Health's regulations concerning county houses of correction require plumbing facilities or adequate substitutes within "[e]ach cell within which an individual may be locked for any part of a 24-hour day," 105 C.M.R. 450.113, and ex-

pressly prohibit the use of "night soil pots," id., § 450.119 such as the bucket plaintiff was required to use to dispose of his bodily wastes.

In 1972, the Second Circuit Court of Appeals held that the conditions of an isolation "strip cell" at the Connecticut Correctional Facility in Somers, Connecticut fell below the "irreducible minimum of decency required by the Eighth Amendment." Lareau v. MacDougall, 473 F.2d 974, 978 (2nd Cir. 1972), cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). The court in Lareau found "most offensive" the use of a "Chinese toilet"—a hole in the floor in the corner of the cell covered by a grate which was flushed by a manually controlled valve operated from outside the cell—and commented that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." Id. Citing Lareau, the district court in Osborn v. Manson, 359 F.Supp. 1107 (D.Conn.1973) commented that with respect to providing buckets to inmates in administrative segregation for disposal of their bodily wastes, "my constitutional calipers are not sufficiently refined to distinguish between a hole in the floor, controlled by a flush mechanism outside the cell, and a bucket in the cell that a prisoner cannot empty as required." Id. at 1111. See also, Bel v. Hall, 392 F.Supp. 274, 276–77 (D.Mass.1975).

■ The use of a "soil pot" is not the sole source of offensiveness in this case. Plaintiff was limited to fifteen minutes of exercise outside his cell each day, see Osborn v. Manson, supra at 1112 (requiring prison administrators to afford inmates in isolation one hour of exercise per day outside of their cell), and plaintiff's statement in his affidavit that he was not allowed to shower during the period of his confinement in the hospital isolation cell remains unrebutted. See 103 C.M.R. § 975.03. Furthermore, the conditions of confinement to which plaintiff was subjected were not of short duration, Hutto v. Finney, 437 U.S. at 686–87, 98 S.Ct. at 2571 (conditions which might be

tolerable for a few days may become intolerable if imposed for weeks or months.)

As was noted by the Court in *Lareau:* Courts must be particularly careful not to intercede needlessly on behalf of an inmate engaged in a dispute with prison administrators.... The Eighth Amendment should not be used to divest prison authorities of the administrative discretion necessary to maintain order and discipline in penal institutions. Unless a prisoner is exemplarily punished for violating a prison regulation, he and other prisoners will not be deterred from committing further offenses; and the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender should be left to the informed judgment of prison authorities. But prison authorities, no less than sentencing judges, are bound by the strictures of the Eighth Amendment. Disciplinary measures that violate civilized standards of human decency are proscribed.

473 F.2d at 978 (citations omitted); *see also Layne v. Vinzant,* 657 F.2d 468, 471 (1st Cir. 1980). Thus, even under the circumstances of this case, where plaintiff was charged with five serious acts of misconduct and defendants considered isolation an appropriate and necessary sanction, the unavailability of the cells normally used for isolation of inmates cannot justify subjecting plaintiff to the unconstitutional conditions of the hospital isolation cells.[7]

■ There remains the issue of whether the undisputed factual record supports imposition of damages liability on defendants Ashe and Fiorentino, an issue severable from the question of the availability *vel non* to them of an affirmative defense based

upon qualified immunity. In *Furtado v. Bishop,* 604 F.2d 80 (1st Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980), the First Circuit Court of Appeals observed that:

Section 1983 is to be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' *Monroe v. Pape,* 365 U.S. 167, 187 [81 S.Ct. 473, 484, 5 L.Ed.2d 492] (1961) *overruled on other grounds, Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 663 [98 S.Ct. 2018, 2021, 56 L.Ed.2d 611] (1978). When a person's conduct is a 'substantial factor and a material element' in bringing about a foreseeable injury, he can be held liable for that injury.' *Hillard v. Williams,* 516 F.2d 1344, 1351 (6th Cir. 1975) *vacated on other grounds,* 424 U.S. 961 [96 S.Ct. 1453, 47 L.Ed.2d 729] (1976). *See* W. Prosser, Law of Torts, § 42 at 244–48 (4th ed. 1971).

604 F.2d at 89. While the issue of whether "mere negligence" alone is sufficient to state a cause of action under § 1983 must be considered to remain open to argument, *see, e.g., Parratt v. Taylor,* 451 U.S. 527, 532–33, 101 S.Ct. 1908, 1911, 68 L.Ed.2d 420 (1981), at least in the context of § 1983 claims for infliction of cruel and unusual punishment the cases establish that something more than negligence is a predicate for damages liability. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1975) ("deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.") However, even in the very context of *Estelle,* that is, medical care for inmates, the Court of Appeals for this Cir-

---

7. The First Circuit Court of Appeals has suggested that "[w]here there are so many nuances and facts to evaluate and reasonable people could differ as to whether, overall, Eighth Amendment standards were transgressed, we think traditional concepts of the role of the jury make it proper that the final judgment be left to the jury." *Hawkins v. Hall,* 644 F.2d 914, 917 n. 2 (1st Cir. 1981). However, *Hawkins* involved a confinement of less than twenty-four hours in a strip cell for psychiatric obser-

vation, and indeed nuances and factual issues were abundant. *See, id.* at 916. In this case the extended period of confinement under offensive conditions obviates the need for jury determination of whether the disciplinary sanction imposed on plaintiff offended "society's evolving sense of decency." *Id.* at 917, *see also Nadeau v. Helgemoe,* 561 F.2d 411, 413 (1st Cir. 1977). In any event, neither plaintiff nor defendants requested a jury trial in this case. *See* F.R.Civ.P. 38(d).

cuit has held that "[w]hen a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety." *Layne v. Vinzant, supra,* 657 F.2d at 471, *citing West v. Rowe,* 448 F.Supp. 58, 60 (N.D.Ill.1978); *Corby v. Conboy,* 457 F.2d 251, 254 (2nd Cir. 1972); and *Martinez v. Mancusi,* 443 F.2d 921, 924 (2nd Cir. 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971).

■ It is well settled that § 1983 does not encompass a theory of damages liability based upon respondeat superior, *Monell v. Department of City Services of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, while there is some evidence in this record that the guards supervising the medical unit in which the hospital isolation cell was located did not follow policies and procedures which would have alleviated to some extent the severity of plaintiff's confinement in isolation, at the same time defendants have testified in their depositions that a great deal of discretion was afforded guards in their treatment of inmates confined in the hospital isolation cells. Deposition of Defendant Ashe at 23–27; Deposition of Defendant Fiorentino at 30. In any event, the factual record does not create a genuine issue about the degree of involvement of defendants Ashe and Fiorentino in the events which resulted in plaintiff's confinement in the hospital isolation cell under conditions violative of his constitutional rights. Both defendants were fully aware of and approved the actions of the Disciplinary Board, but for reducing the total sanction from sixty days in hospital isolation to fifty days. Both knew that the hospital isolation cells were below state minimum standards and that inmates were often provided soil pots to dispose of their bodily wastes. Finally, both Ashe and Fiorentino were put on actual notice of the conditions to which Strachan was being subjected, especially the fact that he was compelled to use an uncovered bucket to dispose of his bodily wastes, by the letter from plaintiff's counsel, yet the record is silent as to specific actions defendants took in their supervisory capacities to remedy the situation brought to their attention. These undisputed facts are sufficient to establish at least recklessness on the part of defendants, if not intentional misconduct. In either case, there is an adequate basis for damages liability under § 1983 for deprivation under color of state law of plaintiff's constitutional right to be free from cruel and unusual punishment.

### D. *Good Faith Immunity*

In their opposition to plaintiff's motion for partial summary judgment, defendants have asserted that there are genuine issues of material fact as to whether they are immune from damages liability under 42 U.S.C. § 1983 because of the qualified immunity afforded prison officials. Plaintiff in response contended that the failure of defendants to plead good faith immunity as an affirmative defense has effectively waived it, and moved to strike two affidavits filed by defendants.

■ At the time the complaint was filed in this action, the law of this circuit required a § 1983 plaintiff to plead the bad faith of a public official in order to state a claim under § 1983, but this holding was subsequently reversed by the Supreme Court. *See Gomez v. Toledo,* 602 F.2d 1018, 1020 (1st Cir. 1979), *reversed,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Paragraph 21 of plaintiff's initial complaint appears to have been designed to comply with the First Circuit's holding in *Gomez,* and was specifically denied by defendants in their answer. Given the Supreme Court's reversal of *Gomez* in 1980, and the high court's holding placing the burden of pleading qualified immunity with the defendant, *see* 446 U.S. at 640, 100 S.Ct. at 1923, defendants might reasonably have been expected to seek leave to amend their answer to plead good faith affirmatively somewhat earlier than June 10, 1982. Nonetheless, since the initial complaint and answer at least suggested that the question of qualified immunity was in issue, and because the

Supreme Court in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) made clear that the declaration of F.R.Civ.P. 15(a) that "leave to amend shall be given freely when justice so requires" is a mandate to be heeded, *id.* at 182, 83 S.Ct. at 230, *see also Vargas v. McNamara,* 608 F.2d 15, 18–19 (1st Cir. 1979), I will allow defendants' motion to amend their answer and address the merits of their asserted immunity defense. *See generally,* 3 Moore's Federal Practice (2nd ed. 1982) ¶ 15.08[3] (F.R. Civ.P. 15(a) "applies equally to plaintiffs and defendants and leave to amend may be sought for any purpose relating to the pleadings. The clearest cases for leave to amend are correction of an insufficient claim or defense and amplification of previously alleged claims and defenses." (footnotes omitted)).

In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court extended the qualified immunity defense to damages liability under § 1983 to prison officials, *id.* at 561, 98 S.Ct. at 859, and reiterated the description of qualified immunity set forth in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975):

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of the government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Procunier v. Navarette, supra,* 434 U.S. at 561–62, 98 S.Ct. at 859, *quoting Scheuer v. Rhodes, supra,* 416 U.S. at 247–48, 94 S.Ct. at 1692. The Court expressly limited the scope of this immunity, however, *quoting* in part from *Wood v. Strickland, supra,* as follows:

This degree of immunity would be unavailable, however, if the official "knew or reasonably should have known that the action he took within the sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the student." [*Wood v. Strickland, supra,* 420 at 322, 95 S.Ct. at 1001]. The official cannot be expected to predict the future course of constitutional law, ..., *Pierson v. Ray* [386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967)], but he will not be shielded from liability if he acts "with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U.S. at 322, 95 S.Ct. at 1001.

*Procunier v. Navarette, supra,* 434 U.S. at 562, 95 S.Ct. at 859.

In light of these authorities, I must conclude defendants have failed to establish a genuine issue concerning the availability to them of a defense based upon good faith. An inmate's constitutional right to adequate and hygienic means to dispose of his bodily wastes was clearly established at the time the incidents complained of by Strachan occurred; indeed, existing state regulations codified the holdings of cases in the early 1970's that the use of "night soil pots" or their equivalent was constitutionally offensive. Defendants knew of the conditions in the hospital isolation cells—the lack of plumbing and the absence of bed frames—and defendant Fiorentino acknowledged a policy of no exercise for inmates held in isolation, but for the provision to inmates of pamphlets describing isometric exercises. Deposition of Nick Fiorentino, at 49.

Concededly, defendants were constrained in their disciplinary options by the unavailability of particular cells and shortcomings in budgetary appropriations, but neither these facts nor the defendants' assertions in their affidavits that they approved of the "con-

finement of plaintiff ... to serve the best interests of the plaintiff and of the institution in maintaining a safe and secure institution," Affidavit of Defendant Fiorentino at 2, Affidavit of Defendant Ashe at 2, are sufficient to establish a basis for finding that defendants acted in good faith. Both defendants "knew or reasonably should have known" that their actions in confining plaintiff Strachan in the hospital isolation cell for an extended period of time deprived plaintiff of clearly established constitutional rights. *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 859. As serious as the misconduct of plaintiff might have been, and no matter how appropriate the sanction of confinement in isolation might have appeared, these considerations do not justify the imposition of unconstitutional conditions of confinement on the plaintiff.

On the factual record presented, defendants have not established the existence of a genuine issue of material fact on the question of whether they are entitled to qualified immunity to damages liability under § 1983.

Therefore, I will enter an order allowing plaintiff's motion for partial summary judgment on the issue of the liability for damages under 42 U.S.C. § 1983 of defendants Ashe and Fiorentino and this case may proceed to trial on the issue of damages.

### Conclusion

For the reasons stated herein, I conclude that plaintiff's claims for injunctive and declaratory relief are moot and this case is not a suitable exception to the usual requirement that a class representative have a live case or controversy at the time the class is certified, and I will therefore deny plaintiff's motion for classification pursuant to F.R.Civ.P. 23. Further, because I conclude there are no genuine issues of material fact with respect to plaintiff's damages claim against defendants pursuant to 42 U.S.C. § 1983 for deprivation of his right to be free from cruel and unusual punishment and that plaintiff is entitled to judgment as a matter of law, I will enter an order allow-

ing plaintiff's motion for partial summary judgment, F.R.Civ.P. 56(c).

Order accordingly.